UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARLENE McDAY, individually and as Executrix of the Estate of DANTE TAYLOR, and TEMPLE McDAY,<br><br>                              Plaintiffs,<br><br>– against –<br><br>STEWART ECKERT, Superintendent, Wende Correctional Facility; MARGARET STIRK, Unit Chief, Wende Correctional Facility; KRISTEN MURATORE, Forensic Program Administrator, Wende Correctional Facility; SERGEANT TIMOTHY LEWALSKI; SERGEANT SCOTT LAMBERT; CORRECTION OFFICER McDONALD; CORRECTION OFFICER FREEMAN; CORRECTION OFFICER THOMAS WHITE; CORRECTION OFFICER J. HORBETT; CORRECTION OFFICER D. JANIS; CORRECTION OFFICER MELVIN MALDONADO; CORRECTION OFFICER MARK COLLETT; CORRECTION OFFICER GREIGHTON; CORRECTION OFFICER THEAL; CORRECTION OFFICER BARON; JILL OLIVIERI, R.N.; DIANE DIRIENZO, R.N.; LISA PRISHEL, R.N.; DEBRA STUBEUSZ, M.D.; ANJUM HAQUE, M.D.; BERTRAM BARALL, M.D.; KELLY KONESKY, LCSW-R; DANA MANCINI, SW2; JOHN and JANE DOES 1-10; and JOHN and JANE SMITH 1-14,<br><br>                              Defendants. | No.<br><br><br><br>**COMPLAINT<br>AND JURY DEMAND** |

## PRELIMINARY STATEMENT

1.      Plaintiffs Darlene and Temple McDay bring this civil rights action arising

out of the death of Darlene McDay's son, and Temple McDay's grandson, Dante Taylor. Mr.

Taylor committed suicide on October 7, 2017 while he was incarcerated at Wende Correctional

Facility ("Wende") and in the custody of the New York State Department of Correction and

Community Supervision ("DOCCS"). He had been in DOCCS custody for one year and two weeks. He was 22 years old. Plaintiffs commence suit against the correction officers who brutally beat Darlene's son beyond recognition on the evening of his death and the officials and practitioners who recklessly and callously failed to initiate appropriate suicide prevention measures and denied her son good and accepted treatment throughout his time in DOCCS custody.

2.      From as early as his admission to DOCCS in 2016, DOCCS staff knew that Mr. Taylor checked the boxes for many chronic risk factors for suicide. Mr. Taylor had reported that he was sexually and physically abused as a child. He was confined in a psychiatric facility as a teenager. He had made multiple prior suicide attempts, including one for which he was discharged from the U.S. Marines as a result.

3.      On top of these longstanding risk factors, Mr. Taylor experienced a cascade of stressful, distressing events that further escalated his risk for suicide in the weeks leading up to his death. He and his wife had recently divorced. His grandfather, a close paternal figure, had recently passed away. He faced a life sentence without parole. He experienced harassment by prison staff. He felt that he was a burden to his family. He struggled with substance abuse. He had recently spent four months in solitary confinement ("Keeplock") where he had made a serious suicide attempt. All of these events were clearly documented in his clinical records. But Defendants repeatedly ignored the glaring warning signs that Mr. Taylor was at exceptionally high risk for suicide.

4.      On October 5, 2017, two days before his death, Mr. Taylor used synthetic marijuana and suffered a negative drug reaction. He reported that he was going to harm himself. Mr. Taylor was taken to the Wende Mental Health Unit ("MHU"), placed on suicide watch, and

sent back to his cell the next morning—with no additional observation, oversight, or care.

5.      On October 6, 2017, the night before his death, Mr. Taylor again experienced a negative drug reaction. This time, however, instead of being taken to the MHU, a group of correction officers went to Mr. Taylor's cell and brutally beat him until he was unconscious. The officers "hogtied" Mr. Taylor by his hands and feet. Mr. Taylor was treated for multiple blunt force injuries at the Wende clinic, and then at Erie County Medical Center.



*Figure 1: D. Taylor and D. McDay in 2017 (Family)*          *Figure 2: D. Taylor 10/6/17 (DOCCS)*

6.      Mr. Taylor returned from the hospital to Wende in the early hours of October 7, 2017. He was brought to the infirmary, in pain from the beating, which made it difficult to eat or breathe. Mr. Taylor requested to speak to MHU and to call his family. DOCCS

staff denied both of these requests, claiming that Mr. Taylor had lost phone privileges because he was now in "Keeplock" as a result of his drug use.

7.  Incredibly, even though his mental health providers had placed him on suicide watch less than two days earlier, and knew that he was facing still more time in Keeplock—a trigger for suicide both in general and specifically for Mr. Taylor— Defendants ignored all the information at their disposal about Mr. Taylor's risk for suicide. With reckless and wanton disregard for Mr. Taylor's known suicidal risk, Defendants failed to place Mr. Taylor on suicide watch. Defendants failed to address that Mr. Taylor had just been the victim of a vicious beating and its triggering impact. Defendants denied Mr. Taylor access to mental health and his family. Defendants failed to provide Mr. Taylor with even the minimum level of appropriate medical care, supervision, and observation.

8.  Several hours after he returned from the hospital emergency room on October 7, 2017, Mr. Taylor was found dead in his infirmary cell at 10:20 a.m.  He was in a seated position with a bedsheet wrapped around his neck.

9.  Mr. Taylor's death was foreseeable and avoidable. Although he faced a life in prison, no judge had sentenced Mr. Taylor to death. Had Defendants met their basic constitutional duties, Mr. Taylor would still be alive today. He would be able to maintain relationships with his family and friends, pursue his intended legal appeals to his conviction, and contribute to society going forward in whatever manner was possible.

10.  New York State faces an ongoing epidemic of suicides by people confined in its prisons. For too long, DOCCS has allowed this crisis to fester, leading to an annual death toll that far exceeds any norm in comparable prison systems. Defendants' actions, or lack thereof, were contrary to law, contrary to sound medical practice, and contrary to the norms of a civilized

society. This complaint, arising from these unlawful acts, seeks compensatory and punitive damages pursuant to applicable law.

<u>**JURISDICTION AND VENUE**</u>

11.     This action arises under the Eighth, Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state common law.

12.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the laws of the State of New York.

13.     The acts complained of occurred in the Western District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2).

<u>**PARTIES**</u>

14.     Dante Taylor was a citizen of the United States and resided at Wende Correctional Facility, Erie County, at the time these events occurred.

15.     Darlene McDay is Mr. Taylor's mother. She is a citizen of the United States and a resident of New York, and was appointed the executrix of Mr. Taylor's estate on November 16, 2017.

16.     Temple McDay is Mr. Taylor's maternal grandmother. She is a citizen of the United States and a resident of New York.

17.     At all times relevant hereto, Defendant Stewart Eckert was the Superintendent of Wende within DOCCS, acting under color of state law. As Superintendent, his responsibilities included the care, custody, and control of all inmates, as well as the supervision of all staff. He was responsible for the creation, promulgation, implementation, and oversight of policies and programs governing on-site medical treatment of inmates at Wende. As Superintendent, Eckert had a duty to ensure the physical safety and wellbeing of the people incarcerated at Wende and to provide them with fundamental human necessities, including

medical care.

18.     On information and belief, at all times relevant hereto, Defendant Margaret Stirk was a New York State Office of Mental Health ("OMH") Forensic Unit Chief assigned to the Wende Satellite Mental Health Unit, where she exercised supervisory authority on behalf of the DOCCS and OMH. Defendant Stirk participated in and/or had knowledge of and failed to intervene in the denial of adequate medical treatment to Mr. Taylor.

19.     On information and belief, at all times relevant hereto, Defendant Kristin Muratore was an OMH Forensic Program Administrator assigned to the Wende Satellite Mental Health Unit, where she exercised supervisory authority on behalf of the DOCCS and OMH. Defendant Muratore participated in and/or had knowledge of and failed to intervene in the denial of adequate medical treatment to Mr. Taylor.

20.     Defendants Eckert, Stirk, and Muratore (collectively "the Wende Supervisors") were, at all times relevant hereto, senior officials at Wende Correctional Facility who exercised policymaking, supervisory, and disciplinary authority on behalf of the DOCCS and OMH, acting under color of state law.

21.     On information and belief, at all times relevant hereto, Defendant Debra Stubeusz, M.D. was a physician assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

22.     On information and belief, at all times relevant hereto, Defendant Anjum Anwar Haque, M.D. was a psychiatrist assigned to Wende, where he was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

23.     On information and belief, at all times relevant hereto, Defendant Bertram Barall, M.D. was a psychiatrist who treated inmates at Wende, where he was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

24.     On information and belief, at all times relevant hereto, Defendant Kelly Konesky was a licensed clinical social worker assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

25.     On information and belief, at all times relevant hereto, Defendant Dana Mancini was a licensed clinical social worker assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

26.     On information and belief, at all times relevant hereto, Defendant Jill Olivieri was a registered nurse assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

27.     On information and belief, at all times relevant hereto, Defendant Diane Dirienzo was a registered nurse assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

28.     On information and belief, at all times relevant hereto, Defendant Lisa Prishel was a registered nurse assigned to Wende, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

29.     On information and belief, at all times relevant hereto, Defendant Jane Smith 1 was a physician assigned to Wende as Clinical Director of the OMH Satellite Unit, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

30.     On information and belief, at all times relevant hereto, Defendant Jane

Smith 2 was assigned to Wende as Facility Health Services Director, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

31. On information and belief, at all times relevant hereto, Defendant Jane Smith 3 was assigned to Wende as the OMH SHU guidance counselor, where she was responsible for the provision of appropriate medical care to patients, including Mr. Taylor.

32. On information and belief, at all times relevant hereto, John and Jane Smith 4-14 were medical personnel assigned to Wende, where they were responsible for the provision of appropriate medical care to patients, including Mr. Taylor. Some or all of the John and Jane Smith Defendants were also members of the Joint Case Management Committee, which reviews, monitors, and coordinates the behavior treatment plan for prisoners who are both on the OMH caseload and assigned to SHU, including Mr. Taylor.

33. On information and belief, at all times relevant hereto, Defendants Debra Stubeusz, Anjum Haque, Bertram Barell, Jill Olivieri, Diane Dirienzo, Lisa Prishel, Kelly Konesky, Dana Mancini, Jane Smiths 1-3, and John and Jane Smith 4-14 ("the Medical Defendants") were physicians, physician's assistants, nurses, social workers, and/or mental health care providers who participated in and/or had knowledge of and failed to intervene in the denial of adequate medical care to Mr. Taylor. Their duties to provide medical care to inmates at Wende included but were not limited to caring for all patients in their assigned areas at Wende, which included, but was not limited to, cell visits, physical examinations, identification of acute conditions, design and implementation of appropriate plans to facilitate care, provision of medications, coordination of treatment with other providers, direct oversight and supervision of nursing staff, and/or provision of emergency medical care. At all relevant times hereto, the Medical Defendants were acting under color of state law. Their responsibilities were required to

be carried out in a manner consistent with the legal mandates that govern the operation of New York prisons, including DOCCS and OMH policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. Some of the Medical Defendants are sued under fictious designations because Plaintiffs have been unable to ascertain their names, despite reasonable efforts to do so.

34. On information and belief, at all times relevant hereto, Defendant John Doe 1 was assigned to Wende as the SHU/Separate KL Unit Security Supervisor, where he was responsible for the provision of appropriate supervisory care to inmates on SHU and/or Keeplock, including Mr. Taylor.

35. On information and belief, at all times relevant hereto, Sergeant Timothy Lewalski, Sergeant Scott Lambert, Correction Officer ("CO") Melvin Maldonado, CO Thomas White, CO J. Horbett, CO D. Janis, CO McDonald, CO Freeman, and John Doe 1-10 were DOCCS officers working at Wende, who participated in and/or had knowledge of and/or failed to intervene in the assault of Mr. Taylor on October 6, 2017.

36. On information and belief, at all times relevant hereto, CO Mark Collett, CO Greighton, CO Theal, and CO Baron were DOCCS officers working at Wende, who enforced Keeplock sanctions against Mr. Taylor upon his return from Erie County Medical Center on October 7, 2017.

37. At all times relevant hereto, Sergeant Timothy Lewalski, Sergeant Scott Lambert, CO Melvin Maldonado, CO Mark Collett, CO Thomas White, CO J. Horbett, CO D. Janis, CO Greighton, CO Theal, CO Baron, CO McDonald, CO Freeman, and John Doe 1-10 (the Officer Defendants") were acting under color of state law. Some of the Officer Defendants are sued under fictious designations because Plaintiffs have been unable to ascertain their names and

shield numbers, despite reasonable efforts to do so.

38.     All Defendants are sued in their individual capacities.

## JURY DEMAND

39.     Plaintiffs demand trial by jury in this action.

## STATEMENT OF FACTS

40.     Dante Taylor was born on April 29, 1995 in Medford, New York.

41.     Mr. Taylor graduated from Patchogue-Medford High School in 2013.

42.     As an adult, Mr. Taylor reported to mental health providers that he had suffered physical and sexual abuse from an adult in his life during his childhood years.

43.     In or about 2009, Mr. Taylor attempted to hang himself in his grandmother's home.

44.     As a young teenager, Mr. Taylor was hospitalized for an extended period of time at an in-patient facility for young people.

45.     On September 23, 2013, a few months after graduating high school, Mr. Taylor joined the United States Marine Corps.

46.     In April 2014, while enrolled in the U.S. Marines, Mr. Taylor attempted suicide by hanging.

47.     On April 22, 2014, Mr. Taylor was discharged from the U.S. Marines on medical grounds due to his suicide attempt.

48.     After his discharge from the U.S. Marines, Mr. Taylor returned to the Medford area where his family lived.

49.     On July 14, 2014, Mr. Taylor was arrested and booked at the Suffolk County Jail.

50.     Mr. Taylor was subsequently transferred and held at the Nassau County

Jail for the duration of his trial.

51. On July 12, 2016, Mr. Taylor and his childhood friend Janine Conroy were married at the Nassau County Jail.

52. On July 29, 2016, Mr. Taylor was convicted of two felony charges. He received a life sentence without parole.

**Mr. Taylor Enters the DOCCS System on September 16, 2016**

53. On or about September 16, 2016, Mr. Taylor was transferred to Downstate Correctional Facility for intake into the DOCCS system.

54. The same day, Mr. Taylor underwent an initial mental health screening and evaluation at the Downstate OMH Satellite Unit.

55. The evaluator, Associate Psychologist Albert Gilliam, documented Mr. Taylor's history of mental health issues and chronic suicide risk factors, including that Mr. Taylor had twice previously attempted suicide and was an in-patient at a community mental health program in 2009.

56. Dr. Gilliam recorded that Mr. Taylor's suicide risk warning signs or triggers included "his current incarceration, suicide attempts, length of prison term, severity of crime, substance abuse and medical issues."

57. Dr. Gilliam diagnosed Mr. Taylor "on Axis 1: Unspecified anxiety disorder, Unspecified depressive disorder," and with moderate alcohol and Cannabis use disorders.

58. Despite Mr. Taylor's history of two suicide attempts, and significant mental health problems, Dr. Gilliam did not designate Mr. Taylor as Mental Health Level 1 or 2.[1]

---

[1] Under the OMH Guidelines, Mental Health Level 1 is for inmates "who need or may need psychiatric treatment for

59.     Dr. Gilliam instead designated Mr. Taylor as Mental Health Level 3 and indicated that he "does not have Serious Mental Illness (SMI) diagnosis."

60.     On September 23, 2016, Mr. Taylor was prescribed two medications: Celexa and Vistaril.

61.     Celexa is an antidepressant used to treat major depressive disorder, among other mental disorders.

62.     Vistaril is a sedative used to treat anxiety and tension.

**Mr. Taylor Arrives at Wende, and Reports His Current and Past Suicidality**

63.     Mr. Taylor was transferred from Downstate to Wende on October 13, 2016.

64.     On October 17, 2016, just a few days after Mr. Taylor arrived at Wende, he reported that he wanted to kill himself.

65.     Thoughts of suicide and self-harm are a significant risk factor for completed suicide in prison.[2]

66.     Mr. Taylor was sent to Wende's MHU for evaluation that same day.

67.     At the MHU on October 17, 2016, Mr. Taylor was evaluated by CSW Dana Mancini. CSW Mancini recorded a Progress Note and a Comprehensive Suicide Risk Assessment

---

a major mental disorder that may require frequent use of mental health services including frequent or anticipated need for placement in an Observation Cell." Mental Health Level 2 is for inmates "who need or may need psychiatric treatment for a major mental disorder and require housing in a facility with full-time OMH staff." Level 3 is for inmates "who need or may need psychiatric treatment and medication for a moderate mental disorder and/or are in remission from a disorder and can function in a facility with part-time OMH staff." Letter from Daniel Martuscello, Dir. of Human Res., Dep't. of Corr. and Cmty. Supervision, to David Hamilton, Ph.D., LMSW, Exec. Sec'y, State Bd. for Soc.Work (Oct. 6, 2011).

[2] OMH Suicide Prevention Office, *1,700 Too Many: New York State's Suicide Prevention Plan 2016-17*, New York State Office of Mental Health, 4 (2016), https://omh.ny.gov/omhweb/resources/publications/suicde-prevention-plan.pdf. [hereinafter "Suicide Prevention Report"]; Lisa Marzano et al., *Prevention of Suicidal Behavior in Prisons*, 37(5), Crisis. 323-334 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5120691/pdf/cri_37_5_323.pdf (identifying suicidal ideation and a history of self-harm as significant risk factors for completed suicide in prison); *see also* Anasseril E. Daniel, *Preventing Suicide in Prison: A Collaborative Responsibility of Administrative, Custodial, and Clinical Staff*, Journal of the American Academy of Psychiatry and the Law Online, 34(2) 165–175 (2006), http://jaapl.org/content/jaapl/34/2/165.full.pdf.

Form.

68.     CSW Mancini documented that "Patient was tearful and stated: 'I can't take this, I've lost everything.'"

69.     A severe sentence, and the prospect of a life sentence, is a significant risk factor for suicidal behavior, since the person may not see a reason to keep living. A person's initial adjustment to a life sentence, and feelings of hopelessness and the sudden narrowing of future prospects, often leads to desperation and suicidal thoughts.[3]

70.     CSW Mancini noted in Mr. Taylor's Comprehensive Suicide Risk Assessment Form that a possible trigger to future suicidal behavior by Mr. Taylor included his being overwhelmed by his sentence of life without parole.

71.     The very purpose of the Comprehensive Suicide Risk Assessment Form is to compel practitioners to identify patients who are at risk of suicide, and to cause them to institute a treatment program consistent with good and accepted medical care and suicide prevention.

72.     CSW Mancini also noted that "Patient stated an officer in C Block since Saturday [three days earlier] has been harassing him and yelling to others on the company that he is a snitch."

73.     Per CSW Mancini's report, Mr. Taylor was so afraid of this unnamed officer that he attempted to request protective custody. The officer threatened Mr. Taylor if he completed the request, so Mr. Taylor did not follow through with it.

74.     Bullying (and fear of retaliation for reporting it) is a significant risk factor

---

[3] Mark Chamberlain, *Be Observant: 10 Warning Signs of Suicidal Inmates,* Lexipol Blog (Mar. 15, 2019), https://www.lexipol.com/resources/blog/be-observant-10-warnings-signs-of-suicidal-inmates/.

for suicidal behavior in prisons.[4]

75.     CSW Mancini noted in Mr. Taylor's Comprehensive Suicide Risk Assessment Form that a possible trigger for Mr. Taylor to engage in future suicidal behavior included "further harassment by other inmates or staff."

76.     At the same October 17, 2016 evaluation, Mr. Taylor reported to CSW Mancini that "he has a history of physical and sexual abuse by his mother's former boyfriend."

77.     Childhood trauma is a significant risk factor for suicidal behavior in prisons.[5]

78.     Mr. Taylor reported to CSW Mancini that "in 2009 he hung himself from a bannister in his grandmother's house," and "in 2014 while in the Marines he cut his wrist . . . and attempted to hang but was found before he could do it."

79.     A history of multiple suicide attempts is a serious red flag that the person is at risk for suicide.[6]

80.     After Mr. Taylor's evaluation, he was admitted to overnight suicide watch.

81.     CSW Mancini was now on notice that Mr. Taylor had a history of chronic suicide risk factors, including suicidal ideation, multiple prior suicide attempts, a life sentence without parole, and being triggered by staff harassment.

82.     Despite this information and CSW Mancini's own determination to place Mr. Taylor on suicide watch, CSW Mancini did not change Mr. Taylor's Mental Health Level to 1 or 2 as required by OMH Guidelines.

---

[4] F. Navarro-Atienzar et al., *Childhood Trauma as a risk factor for suicidal behaviour in prisons,* Rev Esp Sanid Penit 21, 42-51 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6788201/pdf/1575-0620-sanipe-21-01-42.pdf ("Suicidal inmates often experience bullying, recent inmate-to-inmate conflicts, disciplinary infractions or adverse information").
[5] *Id.*; Suicide Prevention Report at 4, *supra* n.1.
[6] Suicide Prevention Report at 4, *supra* n.1; Marzano, *supra* n.1.

83. On information and belief, Mr. Taylor was discharged back to his cell the next day, October 18, 2016.

84. After Mr. Taylor's initial October 17, 2016 evaluation, he was provided a treatment plan by Unit Chief Stirk, CSW Mancini, and Nurse Practitioner Kim Dinelle.

85. Per Mr. Taylor's treatment plan, Unit Chief Stirk, CSW Mancini, and Nurse Dinelle simply kept Mr. Taylor's existing diagnosis of unspecified anxiety disorder, unspecified depressive disorder, and moderate alcohol use.

86. Mr. Taylor's treatment plan required Mr. Taylor to attend an individual therapy session every four weeks at which his suicide risk would be assessed. As part of the treatment plan, Mr. Taylor was required to report at his therapy sessions "signs and symptoms [of suicidal ideation]" and to "reach out to staff if he feels the need to act impulsively."

87. The treatment plan included prescriptions for Celexa and Vistaril.

88. The treatment plan did not change Mr. Taylor's Mental Health Level to 1 or 2 despite his multiple risk factors for suicidal behavior and his diagnosis of unspecified depressive disorder.

89. The treatment plan as designed was wholly insufficient to address Mr. Taylor's suicidal ideation.

90. Unit Chief Stirk, CSW Mancini, and Nurse Dinelle marked "no" for serious persistent mental illness despite Mr. Taylor's extensive psychiatric history.

91. Unit Chief Stirk, CSW Mancini, and Nurse Dinelle failed to follow proper policies and procedures for screening Mr. Taylor for his suicide risk.

92. Beginning in October 2016, Mr. Taylor attended monthly verbal therapy sessions with CSW Mancini.

93. On January 5, 2017, Mr. Taylor requested a mental health appointment after learning that his wife was reportedly seeing another man.

94. Two weeks later, Mr. Taylor reported to CSW Mancini that he and his wife had decided to divorce.

95. A loss of an important relationship is a significant risk factor for suicidal behavior in prison.[7]

96. Mr. Taylor from time to time abused synthetic marijuana ("K2") and other substances while he was at Wende.

97. On June 22, 2017, Mr. Taylor was transferred to Erie County Medical Center after suffering adverse effects from taking drugs, K2 and "Molly."

98. Substance abuse is a significant risk factor for suicidal behavior in prisons.[8]

**Mr. Taylor Receives a 120-Day "Keeplock" Sentence for Substance Abuse**

99. On information and belief, DOCCS disciplined Mr. Taylor for the substance abuse incident that led to his June 22, 2017 hospitalization.

100. On information and belief, as a sanction for the substance abuse, Mr. Taylor was sentenced to 120 days of a modified form of solitary confinement called "Keeplock," to be served from June to October 2017.

101. "People in isolated confinement in New York prisons in SHU or Keeplock spend 22 to 24 hours per day locked in a cell, with generally no meaningful human interaction, programs, jobs, therapy, group interactions, or even the ability to make phone calls. The sensory deprivation, lack of normal human interaction, and extreme idleness have long proven to lead to

---

[7] Marzano, *supra* n.1.

[8] *Id.*; Suicide Prevention Report at 4, *supra* n.1; *see also supra* n. ("Additionally, addicts who know they are going to get cut off have a strong fear of withdrawal that can push them to suicide.").

intense suffering and physical and psychological damage for any person."[9]

102.    Keeplock has been recognized as a tortuous experience that can "exacerbate pre-existing mental illness and create new mental health challenges for any person."[10]

103.    Extended confinement in isolation is a known risk factor for suicide.[11]   In fact, the New York State "SHU Exclusion Law" requires that certain prisoners be diverted or removed from SHU or Keeplock because of its potential to cause psychological harm and suicide.[12]

104.    DOCCS itself has recognized the risk posed by Keeplock in exacerbating inmates' mental health conditions, and that it can be an incubator for suicide. According to DOCCS' own report, "New York state prison inmates in solitary confinement or long-term 'keeplock' units, in which inmates are isolated, were over five times more likely to kill themselves than prisoners in general confinement."[13]

105.    Indeed, DOCCS Directive 4101, titled "Inmate Suicide Prevention," notes that "[p]lacement in a Special Housing Unit/Separate Keeplock Unit/AOSU may be a time when an inmate/Adolescent Offender experiences an increased level of agitation, anxiety, or feelings of depression. Staff should be especially alert for signs and symptoms of the potential for self-harm or suicidal behavior at this time."[14]

---

[9] Marzano, *supra* n.1.

[10] *Id.*

[11] *Mental Health Services in NY Prisons: Hearing Before the Assembly's Corrections and Mental Health Comms.* (N.Y. Nov. 13, 2014) (testimony by Jack Beck, Director of the Prison Visiting Project of the Correctional Association of New York) [hereinafter "Beck Testimony"], available at http://nycaic.org/wp-content/uploads/2013/02/Correctional-Association-of-New-York.pdf.

[12] N.Y. Correct. Law §§ 137, 401 (McKinney 2019).

[13] Ryan Tarinelli, *Inmate's suicide shows need for reforms, advocates say*, AP News (Dec. 15, 2019), https://apnews.com/d9bfc9f8996f336ea068462329a51fff; *see also* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 3 Am. Journal of Pub. Health 104, 442 (2014).

[14] DOCCS Directive 4101, Section II.C.1, "Inmate Suicide Prevention" (last revised Jul. 25, 2019), http://www.doccs.ny.gov/Directives/4101.pdf.

106. Pursuant to Directive 4101 Section II.C.2, the Medical Defendants had a duty to complete three separate mental health and health screening assessments within 24 hours of Mr. Taylor being placed on Keeplock.

107. The purpose of these forms is to compel practitioners to identify patients who are at risk of suicide, and to cause them to institute a treatment program consistent with good and accepted medical care and suicide prevention.

108. On information and belief, the Medical Defendants did not at any time complete these forms before or after Mr. Taylor was placed on Keeplock in June 2017.

109. Per Directive 4101 Section II.C.3, the SHU/Separate KL Unit Security Supervisor, Defendant John Doe 1, had a duty to administer Form #3152-SHU/KL, "Suicide Prevention Screening Guidelines – SHU/Keeplock (KL) Admission" to Mr. Taylor and to enter the completion of the form in the unit activity logbook.

110. On information and belief, Defendant John Doe 1, did not administer Form #3152-SHU/KL.

111. Because Wende is an OMH Level 1 facility, it must have a Joint Case Management Committee ("JCMC") comprised of both DOCCS and OMH staff that reviews, monitors, and coordinates the behavior treatment plan for prisoners who are both OMH patients and assigned to SHU or Keeplock.

112. Mr. Taylor, an OMH patient assigned to Keeplock, should have been evaluated by the JCMC regarding his four-month sentence to Keeplock.

113. On information and belief, the Medical Defendants failed to provide or obtain a JCMC evaluation regarding Mr. Taylor's behavior treatment plan.

114. None of the Medical Defendants recorded an assessment of Mr. Taylor's

Mental Health Level, even though he had been assigned to Keeplock.

115. Because Mr. Taylor had previously been placed on suicide watch at Wende and had a documented history of mental illness, the Medical Defendants should never have placed him in four months of isolation with no immediate assessment of his suicide risk.

116. On information and belief, Mr. Taylor lost his visiting, phone, and package privileges for the time period of the Keeplock sanction.

117. In or around July 2017, shortly after he was placed on Keeplock, Mr. Taylor attempted to commit suicide in his cell using his bedsheet.

**Defendants Document Mr. Taylor's July Suicide Attempt and Growing Acute Risk Factors**

118. On September 14, 2017, Mr. Taylor had a therapy session with CSW Mancini. CSW Mancini recorded a Progress Note for the session.

119. At the therapy session, Mr. Taylor reported "two months ago when he started Keep Lock time he tied a sheet around his neck and tried to hang himself but it hurt too much so he stopped."

120. Mr. Taylor also expressed that he was "feeling depressed and . . . thought about hanging himself" and felt like "a burden to his family."

121. Expressions that someone is a burden to one's family is a significant risk factor for suicidal behavior in prison.[15]

122. Mr. Taylor further identified that "having Keep lock time, with little to entertain himself, makes it hard."

123. In the same Progress Note, CSW Mancini recorded that "serving Keep Lock time is a trigger to [Mr. Taylor's] suicidal thoughts" and that the restriction of family

---

[15] Jon Mandracchia, *Investigating Suicidal Thinking in Men in Prison*, American Foundation for Suicide Prevention (last visited Jan. 30, 2020), https://afsp.org/investigating-suicidal-thinking-men-prison/).

communication to letters was "difficult" for him.

124. Isolation and separation from family are significant risk factors for suicidal behavior in prison.[16]

125. On that same day, September 14, 2017, CSW Mancini made a telephone call to Plaintiff Darlene McDay to inform her that Mr. Taylor was concerned about his grandfather's health.

126. Darlene McDay informed CSW Mancini that Mr. Taylor's grandfather was not doing well, but that Mr. Taylor should not know until Darlene McDay's visit so she could provide him support.

127. CSW Mancini also informed Darlene McDay that she was concerned about Mr. Taylor's deteriorating mental health.

128. Darlene McDay told CSW Mancini that isolation was extremely difficult for Mr. Taylor and that he needed the support of his friends at Wende in order to survive.

129. CSW Mancini assured Darlene McDay that she would update Mr. Taylor's records with the need for him to have support from his peers.

130. On the same day, September 14, 2017, CSW Mancini completed a Comprehensive Suicide Risk Assessment Form for Mr. Taylor.

131. On the form, CSW Mancini noted that Mr. Taylor had recent suicide ideation and "views suicide as problem solving."

132. CSW Mancini also noted that "Possible triggers to future suicidal behavior could be harassment by inmates or staff, further Keeplock or SHU sanctions or being overwhelmed by sentence of life without parole."

---

[16] Marzano, *supra* n.1.

133. Again, CSW Mancini did not change Mr. Taylor's Mental Health Level to 1 or 2, or designate him as "Seriously Mentally Ill," despite his report of a recent suicide attempt and her documentation of multiple significant risk factors for suicide.

134. CSW Mancini also again marked "no" for whether Mr. Taylor was seriously or persistently mentally ill despite Mr. Taylor's extensive psychiatric history.

135. On September 15, 2017, Mr. Taylor participated in a video teleconference with Dr. Barall and CSW Mancini. CSW Mancini recorded a Progress Note for the session.

136. Mr. Taylor told Dr. Barall that he could not identify triggers for his depression and suicidal thoughts but he knew that "Keep lock makes it worse."

137. Mr. Taylor also reported to Dr. Barall an increase in his depression.

138. On September 27, 2017, Mr. Taylor attended another therapy session with CSW Mancini. CSW Mancini recorded a Progress Note for the session.

139. CSW Mancini noted that, "[Mr. Taylor] often thinks about suicide because he just wants the emotional pain to end and death is an end to this pain."

140. At this point, both CSW Mancini and Dr. Barall knew that Mr. Taylor had presented with all of the following acute risk factors for suicide within the last two weeks:

a.    Recent extended confinement and isolation from familial support;

b.    Thoughts and expressions of suicidal intent and a desire for self-harm;

c.    Fear of staff bullying and harassment;

d.    Fear of further Keeplock sanctions;

e.    Probable loss of Mr. Taylor's grandfather, who was gravely ill;

f.    Loss of Mr. Taylor's wife due to her request for a divorce;

g.    Expressions of being a "burden" who caused pain to his family; and

h.     report of a recent serious suicide attempt.

141.     CSW Mancini and Dr. Barall were also aware of Mr. Taylor's underlying chronic risk factors for suicide, including a life sentence; childhood trauma; substance abuse; and a long history of suicide attempts.

142.     Even though CSW Mancini and Dr. Barall knew that Mr. Taylor was confined in conditions that increased his risk of suicide and had led him to attempt suicide within the last two months, they failed to order any—much less increased—supervision of Mr. Taylor, place Mr. Taylor on suicide watch, or move Mr. Taylor to a different location where he could be under increased observation.

143.     On information and belief, Mr. Taylor was discharged from Keeplock in late September 2017.

**Mr. Taylor Again Threatens Suicide and is Admitted to RCTP on October 5, 2017**

144.     On October 5, 2017, at or around 5:15 p.m., Mr. Taylor was taken to the infirmary for a negative reaction to taking K2.

145.     While at the infirmary, Mr. Taylor reportedly stated: "What am I doing here?" and "I want to kill myself" and "I'll hang myself."

146.     Nurse Dirienzo notified MHU about Mr. Taylor's condition.

147.     Dr. Haque arrived at the infirmary to evaluate Mr. Taylor. Dr. Haque recorded a Progress Note for the evaluation.

148.     In his Progress Note, Dr. Haque recorded that Mr. Taylor's grandfather had recently passed away and Mr. Taylor felt sad about it because the two had been close.

149.     A loss of an important relationship is a significant risk factor for suicidal

behavior in prison.[17]

150.    Dr. Haque noted that Mr. Taylor appeared to have vague suicidal ideation and some symptoms of psychosis, and that Mr. Taylor expressed concern about being punished with a disciplinary ticket and solitary confinement due to his K2 use.

151.    Dr. Haque instructed that Mr. Taylor be moved from the infirmary to the Wende Residential Crisis Treatment Program ("RCTP") in the OMH Satellite Unit for observation.

152.    Dr. Haque prescribed Mr. Taylor with Thorazine.

153.    Thorazine is an anti-psychotic medication used to treat psychotic disorders such as schizophrenia or manic-depression.

154.    After Dr. Haque's evaluation, Unit Chief Stirk referred Mr. Taylor to the RCTP.

155.    Dr. Stubeusz, the on-call physician at the time of Mr. Taylor's evaluation, was notified of Mr. Taylor's transfer to the RCTP.

156.    At the RCTP, Mr. Taylor expressed threats of self-harm, which Registered Nurse ("RN") Jill Olivieri recorded in her nursing assessments.

157.    Mr. Taylor was kept at the RCTP overnight.

158.    On October 6, 2017, at 9:30 a.m., Dr. Haque evaluated Mr. Taylor at the RCTP. Dr. Haque recorded a Progress Note for this evaluation.

159.    In his evaluation, Dr. Haque recorded that it was "difficult to determine" if Mr. Taylor had symptoms of psychosis or mania at the time, despite having just prescribed Thorazine to him.

---

[17] Marzano, *supra* n.1.

160.     Dr. Haque made no notes about Mr. Taylor's suicide risk or self-harm threats, or his assessment of the same, despite the immediately preceding note in RN Olivieri's assessment that Mr. Taylor had threated self-harm.

161.     Despite Dr. Haque's stated difficulty in assessing Mr. Taylor's mental state, Mr. Taylor's overnight threats of self-harm, and the fact that Mr. Taylor had not even been under observation for a full day, Dr. Haque instructed that Mr. Taylor be discharged from RCTP observation back to his cell.

162.     In a separate Ambulatory Health Progress Note from October 6, 2017 at 10:00 a.m., Dr. Stubeusz signed off on a medical staff evaluation which noted that Mr. Taylor was yelling, screaming, "not making any sense," and "screaming for 'help.'"

163.     CSW Konesky discharged Mr. Taylor from the RCTP to his cell the morning of October 6, 2017.

164.     CSW Konesky wrote a Progress Note to accompany the discharge stating: "Dr. Haque and this writer interviewed Mr. Taylor yesterday who admitted to saying he was suicidal yesterday because he was anxious after smoking K2 and was uncomfortable with how it made him feel. He is future oriented, looking forward to a planned visit from his family."

165.     CSW Konesky further noted that sanctions were pending against Mr. Taylor.

166.     CSW Mancini had identified possible sanctions such as Keeplock as a suicide risk factor in Mr. Taylor's medical records less than three weeks prior to CSW Konesky's evaluation.

167.     Despite Mr. Taylor's recent substance abuse, recent threats of self-harm, history of suicidal ideation, newly prescribed psychiatric medication, and the pending threat of

triggering sanctions such as Keeplock, CSW Konesky recorded that Mr. Taylor was not a suicide risk and was not "Seriously Mentally Ill."

168. On the morning of October 6, 2017, Mr. Taylor was discharged to his cell without any additional monitoring or modification to his ongoing treatment plan, and without any plan to address his ongoing substance abuse.

169. Defendants Haque and Konesky should have kept Mr. Taylor under observation for at least a 24-hour period following his substance-induced psychosis, or until they had assessed whether Mr. Taylor was mentally fit to be assigned to Keeplock.

170. Defendants Haque and Konesky failed to properly assess Mr. Taylor's risk factors for suicide, and failed to provide him with additional observation, support or monitoring.

171. In short, in the weeks before his death, Defendants documented that Mr. Taylor was displaying myriad chronic and acute factors contributing to increased risk for suicide, including but not limited to: the shock of incarceration and adjustment by a young man to a life sentence in prison; psychological stress caused by bullying, a break up with a romantic partner, disciplinary actions by prison staff, being held in isolation or segregation, a history of social and emotional problems, substance abuse and withdrawal, and a history of prior suicide attempts.[18] Yet Defendants failed to institute any increased observation, support, or monitoring for Mr. Taylor.

**The Officer Defendants Violently Assault Mr. Taylor on October 6, 2017**

172. On October 6, 2017, at around 10:20 pm, Mr. Taylor began having seizures in his cell related to K2 drug use.

---

[18] Linda Peckel, *Preventing Suicide in Prison Inmates*, Psychiatry Advisor (Dec. 19, 2017), https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates/; *see also* Department of Mental Health and Substance Abuse, World Health Organization, *Preventing Suicide in Jails and Prisons* 1-26 (2007), https://www.who.int/mental_health/prevention/suicide/resource_jails_prisons.pdf.

173. Multiple people who were in cells near Mr. Taylor alerted Wende staff that Mr. Taylor was suffering a medical emergency.

174. On information and belief, a group of COs and at least two sergeants, led by Defendant Lewalski and including Defendants Freeman, Lambert, Maldonado, and McDonald, arrived at Mr. Taylor's cell.

175. On information and belief, Defendant Freeman opened Mr. Taylor's cell door for the responding officers.

176. On information and belief, several officers entered Mr. Taylor's cell, including Defendants Lambert, Lewalski, Maldonado, and McDonald.

177. Use of force documents prepared by DOCCS staff state that it was Defendants Lewalski, Horbett, White and Janis who entered Mr. Taylor's cell.

178. On information and belief, Defendants Lambert, Lewalski, Maldonado, and McDonald began to beat Mr. Taylor's head, face and body with their batons, fists, and feet.

179. Men in the adjoining cells heard Mr. Taylor screaming in pain, the sound of sticks hitting his body, and other sounds of an attack.

180. Defendants beat Mr. Taylor until he was unconscious.

181. On information and belief, Defendants Lambert, Lewalski, Maldonado, and McDonald then "hog tied" an unconscious Mr. Taylor by binding his hands and feet with zip ties, causing small lacerations to his wrists and ankle areas.

182. On information and belief, Defendants Lambert, Lewalski, Maldonado, and McDonald carried a motionless and silent Mr. Taylor by his biceps and ankles, face down to the floor, out of his cell and to the top of a stairway leading down from the second floor of the cellblock to the first floor.

183. On information and belief, Defendants Lambert, Lewalski, Maldonado, and McDonald threw Mr. Taylor down the stairs head first.

184. While Defendants Lambert, Lewalski, Maldonado, and McDonald beat Mr. Taylor, Defendant Freeman stood by and failed to intervene to protect Mr. Taylor.

185. Defendants Lambert, Lewalski, Maldonado, and McDonald's beating of Mr. Taylor was vicious in scope and went far beyond the level of force needed to restrain a physically incapacitated person.

186. Mr. Taylor was taken to the Wende infirmary, where his injuries were photographed.

187. Mr. Taylor had suffered multiple blunt force injuries to his head, neck, torso and extremities.

188. To cover up their own vicious assault, Defendants later claimed that Mr. Taylor's injuries were self-inflicted and that he had banged his head against his cell wall.

189. At the Wende infirmary, medical staff recorded that Mr. Taylor had a large hematoma under right eye; the right side of his face was swollen and had ecchymosis; as well as other injuries to his face and body.



*Figure 3: D. Taylor 10/6/17 (DOCCS)*

190. Dr. Stubeusz was notified of Mr. Taylor's condition.

191. Dr. Stubeusz knew that Mr. Taylor had just been admitted to the RCTP for threats of self-harm, was screaming for help and not making sense, had been discharged from the RCTP that morning, recently suffered from two recent drug-induced psychotic episodes, and was the victim of a violent attack.

192. Even if Dr. Stubeusz believed that Mr. Taylor's physical condition was a result of his own negative reaction to K2, and that he had suffered a substance-induced psychosis causing him to engage in serious self-harm, rather than a violent attack, she still had ample information available to her that he was in crisis and at serious risk of self-harm.

193. Still, Dr. Stubeusz failed to order any increased observation or monitoring of Mr. Taylor.

194. Dr. Stubeusz ordered an ambulance to take Mr. Taylor to Erie County

Medical Center for treatment.

195.   On October 7, 2017, around 1:00 a.m., Mr. Taylor was transported by ambulance to Erie County Medical Center in Buffalo, New York. He arrived at Erie County Medical Center around 1:20 a.m.

196.   At the Eric County Medical Center, the hospital documented that Mr. Taylor had facial contusions, significant facial edema and ecchymosis, and complaints of pain in his entire upper body including chest and back.

197.   Mr. Taylor was treated for his injuries and discharged from the hospital at approximately 4:30 a.m. on October 7, 2017.

**History of Staff Abuse Against Mr. Taylor at Wende**

198.   The physical abuse that Mr. Taylor suffered at the hands of Defendants Lambert, Lewalski, Maldonado, and McDonald on October 6, 2017 was not an isolated incident.

199.   Mr. Taylor had suffered various forms of abuse from Wende Correction Officers John Does 1-10 since his arrival at Wende.

200.   On information and belief, Wende Correction Officers John Does 1-10 frequently subjected Mr. Taylor to demeaning taunts.

201.   On information and belief, Wende Correction Officers John Does 1-10 frequently used physical violence on Mr. Taylor, including shoving him into walls and using excessive force when conducting pat-downs.

202.   On information and belief, Wende Correction Officers John Does 1-10 sometimes deprived Mr. Taylor of shower use.

203.   Mr. Taylor reported the abuse by John Does 1-10 to his mother on multiple occasions.

204.    Darlene McDay reported the abusive behavior by John Does 1-10 to Wende administrators before Mr. Taylor's death, and requested that they investigate these incidents

205.    Darlene McDay did not receive an adequate response from the Wende Supervisors or any Wende administrator or official.

**Mr. Taylor Returns to Wende on October 7, 2017: He is Denied Contact with his Family and Mental Health Staff, Threatened with More Keeplock, and Left Alone in a Cell**

206.    Mr. Taylor arrived back at Wende from the hospital around 5:50 a.m. on October 7, 2017.

207.    The on-duty Medical Defendants failed to assess Mr. Taylor's mental health prior to or upon his return from the hospital or institute any plan for his care.

208.    The on-duty Medical Defendants failed to order or conduct a mental health assessment of Mr. Taylor in the aftermath of his beating at the hands of staff.

209.    Upon Mr. Taylor's return to Wende from the hospital, any member of the OMH clinical staff had the authority to place him on a suicide watch.

210.    None of the Medical Defendants ordered that Mr. Taylor be placed in the MHU, RCTP, or on any form of observation or suicide watch at the Wende infirmary.

211.    The Medical Defendants' failure to place Mr. Taylor on any form of observation or suicide watch was in violation of DOCCS and OMH policies, and was wholly inconsistent with good and accepted medical care and suicide prevention protocols.

212.    Mr. Taylor was placed alone in a cell in the Wende infirmary.

213.    Mr. Taylor was immediately confined in SHU/Keeplock conditions, because he was facing misconduct charges for his recent drug use.



*Figure 4: Entrance to Wende Infirmary Cell Denoting Mr. Taylor was on "SHU" status on 10/7/17 (DOCCS)*

214. All on-duty OMH and medical staff were also aware that Mr. Taylor had suffered severe physical trauma the night before.

215. Even if the on-duty Medical Defendants believed that Mr. Taylor had caused his own injuries through self-harm, those injuries—which were shocking in their severity— should have triggered an immediate assessment of Mr. Taylor's capacity and intent to continue to engage in self-harm.

216. Dr. Stubeusz was notified of Mr. Taylor's return to the Wende infirmary.

217. Despite Dr. Stubeusz's knowledge that Mr. Taylor had twice used psychosis-inducing drugs in the last 48 hours, and that Mr. Taylor had been assigned to the RCTP less than 24 hours prior, Dr. Stubeusz again did not order Mr. Taylor to be place under any form of observation or suicide watch.

218. The Medical Defendants failed to assess Mr. Taylor's mental health and

risk of suicide upon his return to Wende—or in the subsequent hours before his death—and failed to react to Mr. Taylor's pattern of self-injurious behavior, in reckless disregard of his serious mental health needs.

219.     At 8:30 a.m. on October 7, 2017, Nurse Prishel recorded that Mr. Taylor was in pain and unable to chew regular food due to the swelling in his face.

220.     At 9:00 a.m., Nurse Prishel provided Mr. Taylor with an ice pack and Motrin.

221.     At 10:00 a.m., Nurse Prishel recorded that Mr. Taylor was "quiet, sullen, requesting OMH" and requesting to contact his emergency contact (his mother).

222.     Nurse Prishel denied Mr. Taylor's request to speak with his emergency contact, documenting that "security" stated that Mr. Taylor was not allowed to contact family because he was "SHU status."

223.     Defendant Officers Collett, Greighton, Theal, and Baron were among the security staff on duty at this time.

224.     On information and belief, Captain Edward Meyer and Lieutenant Alan Herdzik were also on duty at this time. Lieutenant Herdzik was the on-duty Watch Commander.

225.     At this point, Mr. Taylor became aware that he would no longer be able to see his mother and grandmother at their upcoming scheduled visit on October 17, 2017. His records documented that he was looking forward to that visit. Mr. Taylor also became aware that he had no prospect of contacting them in the near future.

226.     Based on Officers Collett, Greighton, Theal, and Baron's direction, Mr. Taylor was kept in SHU status conditions less than 48 hours after being placed in the RCTP for risk of self-harm and suffering a brutal beating that left him unable to eat solid food.

227. Mr. Taylor's medical records reflected that sanctions such as isolation, whether in the form of SHU or Keeplock, were an acute suicide risk factor and trigger for him.

228. Mr. Taylor's medical records reflected that a physical assault by staff or inmates was an acute suicide risk factor or trigger for him.

229. Mr. Taylor's medical records reflected that contact with and support from his family was a positive force protecting him from suicidal ideation.

230. Mr. Taylor's treatment plan required him to contact Wende OMH staff in the event of suicidal ideation or thoughts of self-harm; Mr. Taylor attempted to follow his treatment plan by requesting contact with OMH.

231. Under the direction of Officers Collett, Greighton, Theal, and Baron, Nurse Prishel denied Mr. Taylor contact with OMH. Instead, she placed a referral with OMH for Mr. Taylor to be contacted later.

232. Mr. Taylor requested contact with his family.

233. Nurse Prishel denied Mr. Taylor contact with his family.

234. Nurse Prishel left Mr. Taylor unattended and unobserved in his cell contrary to her obligations under Directive 4101.

235. Directive 4101 Section IV.A states that, in an OMH Level 1 facility with full time OMH staff on duty until 10:00 P.M. (such as Wende), "[i]f an inmate is identified as being in need of an immediate referral to OMH, call Mental Health, notify your supervisor, and notify the Watch Commander. Do not leave the inmate unattended."

236. At the time that Mr. Taylor was denied access to his support network and left unsupervised, the Medical Defendants were aware that Mr. Taylor had a history of depression, attempted suicide, frequent suicidal ideation, and had just suffered a severe beating.

237.     Further, because Mr. Taylor was once again placed on SHU/Keeplock within the infirmary, the SHU/Separate KL Unit Security Supervisor or another qualified individual should have completed a Form #3152-SHU/KL upon his admission to the infirmary per Directive 4101.

238.     Had the SHU/Separate KL Unit Security Supervisor or any qualified individual completed Form #3152-SHU/KL, he or she would have checked "Yes" for the screening question of "Have you tried to commit suicide within the last year?" and been required to make an immediate referral to OMH and notify the Watch Commander.

239.     The failure of any qualified individual to complete Form #3152-SHU/KL contributed to Defendants' many failures to provide Mr. Taylor with minimally adequate mental health care upon his return to Wende.

**Mr. Taylor Commits Suicide in the Wende Infirmary on October 7, 2017**

240.     On October 7, 2017 at 10:10 A.M, shortly after Mr. Taylor was denied his requests to speak to OMH or his family, Nurse Prishel saw Mr. Taylor waving in the window of his cell door.

241.     Nurse Prishel documented that Mr. Taylor "thanked" her for "helping" him.

242.     Mr. Taylor was then left alone and unobserved in his cell.

243.     Ten minutes later, at 10:20 a.m., Mr. Taylor was found in the infirmary in a sitting position with a knotted bed sheet wrapped around his neck and attached to the toilet grab rail.

244.     Mr. Taylor was unconscious, not breathing and without a pulse when he was found. He was in cardiac arrest.

245. At 11:10 a.m., Mr. Taylor was transported to Sisters of Charity Hospital, St. Joseph Campus, in Cheektowaga, New York.

246. Mr. Taylor arrived at Sisters of Charity Hospital at 11:31a.m.

247. Hospital efforts to revive Mr. Taylor failed, and he was pronounced dead at 11:51 a.m.

248. Mr. Taylor was 22 years old at the time of his death.

**Defendants' Longstanding Failures to Prevent Suicides at Wende**

249. All Defendants should have been particularly vigilant in their treatment of Mr. Taylor given the prevalence of suicide in New York prisons generally and at Wende specifically.[19]

250. In 2018, a New York State medical review board determined that fifty New York state prisoners have died in the past five years due to insufficient medical care. Many of the reported deaths were a result of suicide, and a number of them occurred at Wende.

251. In 2010, Raymond Hall committed suicide at Wende. The New York State Commission of Correction ("SCOC") found that Wende failed to provide Mr. Hall with a complete assessment that might have seen the warning signs of suicide.[20]

252. In 2014, two men incarcerated at Wende— Robert Skinner and Todd Heatley— both committed suicide at Wende.

253. Mr. Skinner's death at Wende resulted in the SCOC calling for "'an inquiry into the failure' of a psychiatrist and therapist" to assess his suicide risk.[21]

---

[19] Beck Testimony ("NYS prisons have a suicide rate 50%-70% higher than the national average for state prisons.")

[20] *Report: 7 prison suicides occurred after mental health care lapses*, Poughkeepsie Journal (Apr. 3, 2014, 8:57PM), https://www.poughkeepsiejournal.com/story/news/investigations/2014/04/03/report-7-prison-suicides-occurred-after-mental-health-care-lapses/7280523/.

[21] *Id.*

254. Mr. Heatley's death at Wende similarly raised significant concerns from the SCOC. Mr. Heatley's mother had visited him shortly before his suicide and noted his "distraught" demeanor. She asked a Correction Sergeant to take care of her son, who promised to do so. However, the Correction Officer "determined Heatley was not experiencing an emergency and could be handled by medical staff within the next two weeks. Three days later, Mr. Heatley was found hanging from a bed sheet in his cell.[22]

255. The SCOC determined that "[Heatley] might still be alive had he received proper mental health treatment. The board's report said that DOCCS medical staff 'failed to recognize the symptom of confusion as a sign of mental illness and institute interventions to provide safety to Heatley until he was evaluated by mental health staff.'"[23]

256. In 2015, Mark Koki died at Wende at the age of 39 years old. The SCOC found that the Wende medical staff failed to provide oxygen to Mr. Koki in a timely manner, failed to properly administer potentially lifesaving Narcan medication, and made inconsistent documentation of the medication administration. The SCOC also found that there were delays reported by EMS providers in departing the infirmary and transporting Mr. Koki to the hospital.

257. Also in 2015, Ricky Thomas died at Wende at the age of 49 years old. The final SCOC report found that Wende medical staff failed to evaluate Mr. Thomas's intellectual capacity to understand the significance of his refusal of medication to prevent a myocardial infarction (which was his cause of death) and "significant delay" by facility medical staff in responding to his altered mental status prior to this death.

---

[22] Dale Chappell, *Report Shows 50 New York Prisoners Died from Inadequate Medical Care in Last Five Years*, Prison Legal News, Mar. 5, 2019, at 26, https://www.prisonlegalnews.org/news/2019/mar/5/report-shows-50-new-york-prisoners-died-inadequate-medical-care-last-five-years/.
[23] *Id.*

258.     On October 30, 2018, just over a year after Mr. Taylor's death, a New York State agency, the Justice Center for the Protection of People with Special Needs ("Justice Center"), conducted a compliance visit at Wende.[24]

259.     The Justice Center found that Wende was not in compliance with certain important components of the SHU Exclusion Law designed to protect patients held in SHU.

260.     The Justice Center recommended that "mental health staff be retrained . . . to ensure that inmate/patients are seen in a timely manner and that the OMH Unit Chief should also complete quality assurance checks."[25]

261.     On December 25, 2018, Christian Salazar-Miguel committed suicide at Wende at the age of 20 years old.[26] According to public reports, Mr. Salazar-Miguel had previously tried to commit suicide while in prison, and the cause of his death was also hanging.

262.     On information and belief, Wende Correctional Facility reported to the family of Wende inmate Kaazim Freeman that he committed suicide at the facility on September 6, 2019.

263.     Mr. Freeman's relatives dispute the report that they received regarding his death.

264.     Mr. Freeman's relatives believe that he was handcuffed, taken from his cell, and beaten to death at Wende.

---

[24] New York Justice Center for the Protection of People with Special Needs, Forensic Unit Quarterly Report, 4, 1-11 (2018) https://www.justicecenter.ny.gov/system/files/documents/2019/08/JC%204th%20Quarter%202018.pdf.
[25] *Id.*
[26] Trevor Boyer and Reuven Blau, *Family of 20-year-old prisoner who died on Christmas while in custody seeks answers*, New York Daily News (Dec. 31, 2018, 5:40 a.m.), https://www.nydailynews.com/new-york/ny-metro-prison-death-20181231-story.html ("Salazar-Miguel's death is at least the fourth one inside the maximum security facility investigated by a state medical review panel over the past five years, records show. That includes three others who committed suicide after they received poor medical care and one who suffered a fatal heart attack after he repeatedly refused his medications.").

**Mr. Taylor's Conviction is Abated**

265. Mr. Taylor's appeal of his underlying criminal conviction was pending in the Appellate Division, Second Judicial Department at the time of his death.

266. Mr. Taylor's appeal was dismissed on December 27, 2017 as a result of Mr. Taylor's death.[27]

267. On March 15, 2018, the Supreme Court of the State of New York for Suffolk County entered an order abating Mr. Taylor's conviction.[28]

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Wrongful Death**
**(Against All Defendants)**

268. Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

269. Each of the Defendants was deliberately indifferent to Mr. Taylor's serious medical condition.

270. The Medical Defendants were aware that Mr. Taylor had numerous chronic and acute suicide risk factors that created a significant risk that he would commit suicide; that he had recently made several suicide attempts, which significantly increased the risk that he would commit suicide; and that he was in fact suicidal.

271. The Medical Defendants nevertheless failed to take adequate steps to address and/or mitigate the risk that Mr. Taylor would commit suicide, failed to provide adequate medical treatment, failed to ameliorate Mr. Taylor's placement in Keeplock, failed to monitor Mr.

---

[27] Order, *People v. Dante Taylor*, No. 1649-14 (2d Dept. Dec. 27, 2017).
[28] March 15, 2018 Hearing Transcript, *People of the State of New York v. Dante Taylor*, Indictment No. 1649/2014 (Sur. Ct., Erie County) (Collins, J.).

Taylor continuously when he was at an extreme risk of suicide and/or failed to act on information that indicated that Mr. Taylor was in grave danger.

272. The Medical Defendants were aware that their inaction made it foreseeable that Mr. Taylor would commit suicide, and they consciously disregarded that risk.

273. The Wende Supervisors were deliberately indifferent to their supervisory responsibilities, including but not limited to the provision of adequate training, procedures, screening, staffing, and supervision with regard to suicide prevention at Wende.

274. The Wende Supervisors failed to adequately supervise the Medical Defendants' provision of care of Mr. Taylor (as well as to other individuals confined at Wende), and failed to train their staff to conduct suicide risk assessments and screenings, even in the wake of multiple recent deaths at Wende due to insufficient medical care. Their failure to take measures to curb this neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Taylor.

275. The Wende Supervisors were aware that their inaction made it foreseeable that prisoners at Wende, including Mr. Taylor, would commit suicide, and they consciously disregarded that risk.

276. The Officer Defendants were aware that Mr. Taylor had numerous chronic and acute suicide risk factors that created a significant risk that he would commit suicide, including being the victim of a violent assault the night before he died, and that he had requested mental health care.

277. The Officer Defendants nonetheless failed to take adequate steps to address and/or mitigate the risk that Mr. Taylor would commit suicide.

278. The Officer Defendants were aware that their inaction made it foreseeable that Mr. Taylor would commit suicide, and they consciously disregarded that risk.

279. All Defendants were aware that their actions and omissions created a substantial risk of serious harm.

280. Defendants' conduct was a substantial factor and a proximate cause of the constitutional violations alleged in this Complaint and of Mr. Taylor's resultant damages, hereinbefore alleged.

281. Defendants' deliberate indifference to Mr. Taylor's serious medical condition proximately caused Mr. Taylor to suffer extreme pain and suffering and death.

282. Defendants acted at all relevant times hereto willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscience.

283. Defendants acted under pretense and color of state law.

284. As a result of the foregoing, Defendants deprived Mr. Taylor of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution, and Mr. Taylor suffered the damages hereinbefore alleged.

285. As a result of the foregoing, Mr. Taylor's estate is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Loss of Intimate Association
### (Against All Defendants)

286.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

287.    The hereinbefore alleged deliberate indifference shown by the Defendants to Mr. Taylor permanently deprived Plaintiff Darlene McDay of her constitutional right to intimate association, companionship, and relationship with her son, Mr. Taylor, in violation of 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

288.    The hereinbefore alleged deliberate indifference shown by the Defendants to Mr. Taylor permanently deprived Plaintiff Temple McDay of her constitutional right to intimate association, companionship, and relationship with her grandson, Mr. Taylor, in violation of 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

289.    As a result of Defendants' violation of Plaintiffs' constitutional rights, they suffered and will continue to suffer severe pain and suffering.

290.    As a result of the foregoing, Plaintiffs are each entitled to recover compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Excessive Force
### (Against Officer Defendants and Defendant Eckert)

291.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

292.    On or about October 6, 2017, the Officer Defendants used malicious and

sadistic, gratuitous, excessive, brutal, objectively unreasonable, and unconscionable force on Mr. Taylor, and/or failed to prevent other officers from doing so despite having a reasonable opportunity to intervene.

293.     Defendant Eckert was personally involved in, and caused, the violation of Mr. Taylor's constitutional rights because, among other things, he was aware of the harassment and staff antipathy towards Mr. Taylor before Mr. Taylor's beating, he failed to take remedial action although the staff harassment and bullying was brought to his attention, and he was deliberately indifferent to the rights and safety of Mr. Taylor and other individuals confined at Wende.

294.     Defendants acted under pretense and color of state law.

295.     As a result of the foregoing, the Officer Defendants and Defendant Eckert deprived Mr. Taylor of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the rights guaranteed by the Fourth and Fourteenth Amendment of the United States Constitution to be free from cruel and unusual punishment and gratuitous and excessive force.

296.     The Officer Defendants committed the foregoing acts and/or omissions intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of the consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscious. They are therefore liable for punitive damages.

297.     As a direct and proximate result of the misconduct, unlawful acts, abuses of authority, and deliberate indifference detailed above, Mr. Taylor sustained the damages hereinbefore alleged.

298.     As a result of the foregoing, Mr. Taylor's estate is entitled to recover

compensatory and punitive damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Medical Malpractice**
**(Against the Wende Supervisors and Medical Defendants)**

299.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

300.     At all relevant times, the Medical Defendants undertook to provide medical care—which includes both physical and mental health care—to inmates in its custody at Wende, including Mr. Taylor, and they were legally obligated and had a special duty to do so effectively.

301.     The Medical Defendants were employed, retained and/or contracted with the DOCCS and/or the OMH to provide medical care to all inmates in the care and custody of the State of New York at Wende, including Mr. Taylor.

302.     The Medical Defendants agreed and purported to provide medical care and services to inmates at Wende, including Mr. Taylor, throughout the entirety of Mr. Taylor's incarceration at Wende from October 13, 2016, to his death on October 7, 2017.

303.     The Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and as undertaking services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of Wende inmates, including Mr. Taylor.

304.     The Medical Defendants were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Taylor. In committing these acts, the Medical Defendants failed to act in good faith in carrying out the duties of their employment and abused their power, while still acting under the pretense and color of state law.

305.     As a result of the Medical Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Taylor sustained the damages hereinbefore alleged.

306.     As a result of the foregoing, Mr. Taylor's estate is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

a. An Order declaring that the Defendants have acted in violation of the United States Constitution;

b. An award of compensatory damages for the pain, suffering, mental anguish and distress, emotional distress, loss of enjoyment of life, and death suffered by Dante Taylor, in an amount to be determined at trial;

c. An award of compensatory damages for the pain, suffering, mental anguish and distress, and emotional distress suffered by Darlene McDay and Temple McDay due to the loss of Dante Taylor, in an amount to be determined at trial;

d. An award of punitive damages against the Defendants in an amount to be determined at trial;

e. An award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

f. For such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  February 24, 2020
   New York, New York

           EMERY CELLI BRINCKERHOFF
           & ABADY LLP

             /s/ Katherine Rosenfeld
           Katherine Rosenfeld
           Marissa R. Benavides
           600 Fifth Avenue, 10th Floor
           New York, New York 10020
           (212) 763-5000

           *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARLENE McDAY, individually and as Executrix of the Estate of DANTE TAYLOR, and TEMPLE McDAY,<br><br>                       Plaintiffs,<br><br>        – against –<br><br>STEWART ECKERT, Superintendent, Wende Correctional Facility; MARGARET STIRK, Unit Chief, Wende Correctional Facility; KRISTEN MURATORE, Forensic Program Administrator, Wende Correctional Facility; SERGEANT TIMOTHY LEWALSKI; SERGEANT SCOTT LAMBERT; CORRECTION OFFICER McDONALD; CORRECTION OFFICER FREEMAN; CORRECTION OFFICER THOMAS WHITE; CORRECTION OFFICER J. HORBETT; CORRECTION OFFICER D. JANIS; CORRECTION OFFICER MELVIN MALDONADO; CORRECTION OFFICER MARK COLLETT; CORRECTION OFFICER GREIGHTON; CORRECTION OFFICER THEAL; CORRECTION OFFICER BARON; JILL OLIVIERI, R.N.; DIANE DIRIENZO, R.N.; LISA PRISHEL, R.N.; DEBRA STUBEUSZ, M.D.; ANJUM HAQUE, M.D.; BERTRAM BARALL, M.D.; KELLY KONESKY, LCSW-R; DANA MANCINI, SW2; JOHN and JANE DOES 1-10; and JOHN and JANE SMITH 1-14,<br><br>                    Defendants. | **No.**<br><br><br><br>**CERTIFICATE OF MERIT** |

KATHERINE ROSENFELD, an attorney duly admitted to practice law before the courts of the State of New York, hereby affirms, pursuant to CPLR 3012-a, as follows:

    1.     I am a partner at the law firm of Emery Celli Brinckerhoff & Abady LLP.

    2.     I have secured records relating to the death of Dante Taylor, including records from the New York State Office of Mental Health. I have reviewed the facts of this case and have

consulted with at least one physician who is licensed to practice in this State, or any other State, and I reasonably believe that said physician is knowledgeable as to the relevant issues involved in this particular action, and I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: February 24, 2020
      New York, New York

                                      /s/ Katherine Rosenfeld
                                        KATHERINE ROSENFELD

                                        *Attorney for Plaintiffs*