UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DARLENE McDAY, as Executrix of the Estate
of DANTE TAYLOR,

                    Plaintiff,

-against-

STEWART ECKERT, Superintendent, Wende
Correctional Facility, et al.,

                    Defendants.

Index No. 20 Civ. 0233 (JLS)(JJM)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ECKERT'S MOTION
TO PRECLUDE PLAINTIFF'S EXPERT WITNESS PATRICK HURLEY**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF RELEVANT FACTS ...........................................................................4

ARGUMENT.......................................................................................................................7

    I.      MR. HURLEY'S OPINIONS ARE RELIABLE.....................................................7

           A.      Mr. Hurley's Methods Were Reliable.........................................................8

                  1.      Mr. Hurley Relied on His Extensive Correctional Experience........8

                  2.      Mr. Hurley Reviewed an Extensive Record and Then Explained His Methodology and Opinions in a Reasoned Report ..............................................................................10

           B.      Mr. Hurley Accounted for any Limiting Facts that Could Undermine His Opinions ...............................................................13

           C.      Lewalski Posed a Risk of Harm to People Incarcerated at Wende, Including Mr. Taylor.......................................................................14

    II.      MR. HURLEY'S OPINIONS DO NOT UNFAIRLY PREJUDICE DEFENDANT ECKERT OR ANYONE ELSE .....................................................15

CONCLUSION..................................................................................................................16

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Bruner-McMahon v. Sedgwick Cnty. Bd. of Comm'rs*,
   No. 10-cv-2064, 2012 WL 33837 (D. Kan. Jan. 6, 2012) .................................................. 9

*Carter v. Cnty. of Santa Clara*,
   No. 05-cv-3974, 2008 WL 205597 (N.D. Cal. Jan. 24, 2008)........................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................. 7, 8, 16

*Haley v. Gross*,
   86 F.3d 630 (7th Cir. 1996) ............................................................................................ 9

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) .......................................................................................... 8

*Heflin v. Stewart Cnty., Tenn.*,
   958 F.2d 709 (6th Cir. 1992) .......................................................................................... 9

*Hunt v. CNH Am. LLC*,
   857 F. Supp. 2d 320 (W.D.N.Y. 2012) ............................................................................ 7

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)........................................................................................................ 8

*Marria v. Broaddus*,
   200 F. Supp. 2d 280 (S.D.N.Y. 2002)............................................................................. 9

*Mirena IUD Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018)........................................................................... 12

*Murphy v. Gilman*,
   No. 04-cv-103, 2006 WL 3613754 (W.D. Mich. Dec. 11, 2006)..................................... 9

*Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018)............................................................................. 7

*Parker v. Williams*,
   855 F.2d 763 (11th Cir. 1988) ........................................................................................ 9

*Ramsay-Nobles v. Keyser*,
   No. 16-cv-5778, 2019 WL 4383187 (S.D.N.Y. Aug. 21, 2019).................................... 8, 9

*Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*,
   No. 08-cv-6256, 2012 WL 6628878 (W.D.N.Y. Dec. 19, 2012) .................................... 15

*Veleron Holding, B.V. v. Morgan Stanley,*
117 F. Supp. 3d 404 (S.D.N.Y. 2015)........................................................................ 12, 13

*Wade v. Haynes,*
663 F.2d 778 (8th Cir. 1981) .................................................................................... 9

*Water Pollution Control Auth. Of City of Norwalk v. Flowserve US Inc.,*
No. 14-cv-549, 2018 WL 1525709 (D. Conn. Mar. 28, 2018).......................................... 7

*White v. Watson,*
No. 16-cv-560, 2018 WL 2047934 (S.D. Ill. Sept. 10, 2018)........................................ 9

**Statutes**

42 U.S.C. § 1983 ................................................................................................................ 8

**Rules**

Federal Rule of Evidence 403 ............................................................................................ 7, 15

Federal Rule of Evidence 404(b) ....................................................................................... 3

Federal Rule of Evidence 702 ........................................................................................... 7, 12, 13

Plaintiff Darlene McDay as Executrix of the Estate of Dante Taylor opposes Defendant Stewart Eckert's motion to preclude all testimony offered by Plaintiff's corrections practice and supervision expert, Patrick Hurley (ECF No. 324).

## PRELIMINARY STATEMENT

Prior to the beating and death of Dante Taylor on October 6 and 7, 2017, Defendant Stewart Eckert, the former Superintendent of Wende Correctional Facility ("Wende"), had determined on his own that Defendant Sergeant Timothy Lewalski ("Lewalski") had engaged in a series of uses of force against incarcerated people at Wende that raised "red flags." Defendant Eckert repeatedly referred Lewalski's uses of force to the Department of Corrections and Community Supervision ("DOCCS") Office of Special Investigations ("OSI"), which is DOCCS' internal affairs unit, but did nothing further. Plaintiff alleges that Defendant Eckert was deliberately indifferent to the risks that Lewalski posed to Mr. Taylor and other incarcerated people at Wende.

For this claim, it is important that the jury have an opportunity to learn what an experienced correctional supervisor would perceive in the documentation that Defendant Eckert reviewed leading up to Mr. Taylor's death: what would a ship captain understand from these nautical maps? And what are the range of interventions that would be appropriate for a supervisor in a correctional setting? So, Plaintiff sought expert testimony from expert witness Patrick Hurley on two questions: did the information available to Defendant Eckert show that Lewalski posed a risk of using excessive force against inmates, including Dante Taylor, and was an effective intervention available to him?

Patrick Hurley has more than 36 years of experience working in a range of correctional facilities. He has been a Warden or Deputy Warden for approximately half of that time. He has supervised thousands of prison staff, correctional and otherwise. He has reviewed more than

1

12,000 use of force cases as a prison supervisor, outside auditor, and expert witness. He was recently retained as an auditor for the United States Department of Homeland Security on issues relating to compliance with national prison standards concerning the use of force.

After he had considered the extensive documentary record in this case, Mr. Hurley submitted a 10-page report where he opined that (1) Lewalski's uses of force record under Defendant Eckert's tenure had red flags in it showing that Lewalski posed a risk of using excessive force against inmates at Wende, including Dante Taylor, (2) that there were ways that Defendant Eckert could have immediately mitigated that risk, and (3) that Defendant Eckert did not do so. These are modest, narrow opinions by an undisputedly qualified expert on a subject that calls for expert analysis.

As is crystal clear from his report and deposition testimony, Mr. Hurley is not going to testify at trial that any one of Lewalski's uses of force was improper. He was not there, and he did not see what happened. But Mr. Hurley will opine on the patterns and warning signs from this record that exist irrespective of whether each use of force technically did or did not comply with DOCCS rules. As Defendant Eckert himself explains, the operative test for whether an officer's conduct poses a risk is not whether the officer was found liable in internal disciplinary proceedings or anything like that: patterns in non-meritorious grievances, unsubstantiated disciplinary charges, and lawful uses of force are probative of whether there was "an employee that may be headed down a bad road or that has become problematic and corrective action may be necessary."

Overstating and misapprehending his expert opinions, Defendant Eckert has taken an extreme, *ad hominem*, and confusing position in his motion to preclude Mr. Hurley's expert testimony in its entirety. Defendant Eckert's memorandum name-calls Mr. Hurley a "self-

proclaimed expert on supervising corrections staff." But it is not Mr. Hurley who proclaimed himself an expert on this subject: it is the various courts that have qualified him, his appointment to two Court-supervised independent monitoring teams, and various other assignments across a 36-year career in corrections.

Defendant Eckert accuses Mr. Hurley of "conjur[ing] out of whole cloth a standard of conduct for prison superintendents." Not true. Mr. Hurley's opinion assesses whether there were risk factors in Lewalski's history after reviewing the DOCCS use of force training materials and applies his extensive experience and expertise doing this very type of review in a variety of correctional settings across the country, for decades. Mr. Hurley's opinions have a vastly lesser scope than Defendant Eckert's straw man mischaracterization.

Defendant Eckert accuses Mr. Hurley of "nostalgically look[ing] back at his own career with rose-colored glasses . . . [and] patting himself on the back" because Mr. Hurley offered some examples of his own work as a supervisor in response to deposition questions to that effect. But it should be abundantly clear to all that Mr. Hurley is a highly qualified expert witness not because he personally supervised Lewalski-type officers, but because Mr. Hurley possesses training and experience that allows him to analyze prison records and practices in a way that no one else in this case can—other than potentially Defendant Eckert.

Plaintiff is entitled to attempt to prove her claim that Defendant Eckert was deliberately indifferent to the risk that Lewalski posed to inmates at Wende by offering analysis from an expert that may differ from Defendant Eckert's self-serving one. To the extent that Defendant Eckert is concerned that Mr. Hurley's testimony is somehow an improper workaround of the Rule 404(b) prohibition of propensity evidence against a different, non-Eckert Defendant (it is not), that all can be addressed on a motion *in limine* and by limiting instruction at trial, if

necessary. These are certainly not grounds to preclude Mr. Hurley's participation in this case in its entirety, as Defendant Eckert seeks. Defendant Eckert's motion should be denied.

**STATEMENT OF RELEVANT FACTS**

On October 6, 2017, the Corrections Officer Defendants,[1] led by Defendant Sgt. Timothy Lewalski ("Lewalski"), attacked 21-year-old Dante Taylor in his cell at the Wende Correctional Facility ("Wende") in retaliation for past, perceived rule infractions. *See* Declaration of Daniel M. Eisenberg in Opp. to Mot. to Preclude Patrick Hurley ("Eisenberg Decl.") Exs.[2] A (Mar. 28, 2023 Tr. of Jillian Freeman Dep. ("Freeman Dep. Tr.") at 40:3-41:25); B (Dec. 12, 2023 Tr. of Timothy Lewalski Dep. ("Lewalski Dep. Tr.") at 75); C (OSI000007). They left Mr. Taylor battered and disfigured. Ex. D. He died by suicide shortly after returning to the prison from the outside emergency room. Ex. E (OSI000557-558).

Defendant Stewart Eckert was the Superintendent of Wende at the time, and he had personally reviewed and evaluated Lewalski's rich record of using force on Defendant Eckert's watch between the time that Defendant Eckert became Superintendent of Wende and Dante Taylor's death. Ex. F (May 31, 2024 Tr. of Stewart Eckert Dep. ("Eckert Dep. Tr.")) at 82:4-12. For example:

- Two-thirds of all of Defendant Eckert's referrals to the DOCCS' internal affairs (the Office of Special Investigations or "OSI") involved Lewalski.

- Defendant Eckert referred Lewalski to OSI every five months.

- Lewalski was involved in one serious use of force against an incarcerated person almost every month.

---

[1] The Officer Defendants are Defendants Timothy Lewalski, Melvin Maldonado, Thomas White, James Horbett, Dylan Janis, and Kelly McDonald.

[2] "Ex." refers to exhibits to the declaration of Daniel M. Eisenberg, dated May 23, 2025, filed herewith.

- Almost 50% of the Lewalski uses of force sent an inmate to the local emergency room.

- Lewalski was in the "top three" of *all* staff members with the highest uses of force at Wende.

- In the vast majority of Lewalski's uses of force during Defendant Eckert's tenure at Wende, Lewalski alleged that prisoners had launched surprise, unprovoked attacks on staff, which purportedly justified officers' use of force, and in some cases, grievous bodily harm, in response.

- Lewalski broke his baton on an inmate's legs. He supervised officers' use of force against an inmate who was handcuffed and facing the wall. He used force against an inmate complaining about his missing chess board.

- Uses of force would tend to begin just as officers escorting an inmate entered areas of the prison monitored by Lewalski.

*See* Exs. F at 81:13-25, 46:11-12; G-P.

Plaintiff retained Mr. Hurley to opine on whether the record evidence in this case shows that Lewalski posed a risk of excessive force to inmates, whether there were any interventions by Defendant Eckert that could have mitigated that risk, and whether Defendant Eckert pursued any of those interventions. Ex. Q.

Patrick Hurley has more than 36 years of experience working in a range of correctional facilities. *Id*. at 1-3. He has been a Warden or Deputy Warden for approximately half of that time. *Id.* He has supervised thousands of prison staff, correctional and otherwise. *Id.* He has reviewed more than 12,000 uses of force cases across his capacities as a prison supervisor, outside auditor, or expert witness. *Id.* at 1. He has served as an expert witness on correctional practices, the use of force, and supervision for both plaintiffs and defendants in litigation brought in fourteen different states. *Id.* Mr. Hurley currently serves as a subject matter expert on the use of force for Court-appointed independent monitoring teams overseeing Rikers Island and a juvenile detention facility in Puerto Rico. *Id*. at 2. He was recently retained as an auditor for the

United States Department of Homeland Security on issues relating to compliance with national prison standards concerning the use of force. *Id* at 3.

For his expert report, Mr. Hurley reviewed DOCCS use of force training materials, deposition transcripts, including of Lewalski and Defendant Eckert, Lewalski's unusual incident reports, Defendant Eckert's referrals of Lewalski to OSI, a summary chart of the Superintendent Grievance Tracking System showing grievances against Lewalski alleging staff misconduct, and other records. *Id*. at Exhibit C; Ex. R at 85:21-86:13.

Then, Mr. Hurley relied on his training and experience to offer two opinions: the information available to Defendant Eckert showed that Lewalski posed a substantial risk of using excessive force against inmates, and Defendant Eckert had options to intervene in a way that could have protected Mr. Taylor but Defendant Eckert did not do so. Ex. Q at 4, 9. Mr. Hurley has not offered an opinion about whether any single one of Lewalski's uses of force was improper, although he agrees with Defendant Eckert's own analysis that certain of them required review by OSI. *Id*. Mr. Hurley has also not opined that Lewalski definitively posed a risk of substantial harm to inmates. *Id.* His opinion was limited to whether there were red flags in Lewalski's track record that an experienced supervisor would or should have noticed. *Id.* at 3.

Mr. Hurley identified many interventions available to Defendant Eckert that would not run afoul of any Collective Bargaining Agreement ("CBA"), which in any case, poses no bar and is irrelevant to Plaintiff's claims and Mr. Hurley's analysis. Exs. Q at 10; F at 13:2-16:25, 20:6-18; S (Nov. 11, 2024 Tr. of Matthew Bloomingdale Dep. ("Bloomingdale Dep. Tr.")) at 140:18-141:2; 141:24-142:10. Defendant Eckert's expert witness agrees that these interventions do not violate the CBA. Ex. S (Bloomingdale Dep. Tr.) at 168:2-169:5 ("[Superintendents] can do some of those [interventions], however, they are not required to do those things [].").

6

Almost all of these interventions were also identified by Defendant Eckert himself. Ex. Q at 9-10 (citing Ex. F at 13:2-16:25, 20:6-18). These included: observing and correcting staff, training, mentoring, audits, counseling, instructing a supervisor to meet with an individual, temporarily stopping an employee from going to their tour of duty, and simply having a meeting with the staff member. *Id.* In corrections, when the Superintendent takes notice of an officer's concerning behavior—and actually does something about it—it matters. Ex. R at 239:5-240:9; Ex. Q. But Defendant Eckert did nothing. Ex. F at 83:2-3.

## ARGUMENT

Defendants argue that Mr. Hurley's methods are unreliable under Federal Rule of Evidence 702 and that the probative value of his analysis is substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403. Neither contention merits precluding Mr. Hurley from this case.

## I. MR. HURLEY'S OPINIONS ARE RELIABLE

Federal Rule of Evidence 702 codifies the standard for admissibility set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), under which the Court's role is to determine whether the expert is qualified to testify and whether the testimony is reliable. *Id*. at 589; Fed. R. Evid. 702; *Hunt v. CNH Am. LLC*, 857 F. Supp. 2d 320, 341 (W.D.N.Y. 2012), *aff'd*, 511 F. App'x 43 (2d Cir. 2013) ("It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]"). "If the expert testimony is excluded as inadmissible, the court must make the summary judgment determination without that evidence." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 168 (S.D.N.Y. 2018) (quoting *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 14-cv-549, 2018 WL 1525709, at *5 (D. Conn. Mar. 28, 2018)).

Aside from a stray remark that Mr. Hurley is purportedly a "self-proclaimed" expert, ECF No. 324, Def.'s Mem. of Law in Sup. of Mot. to Preclude Patrick Hurley ("Def.'s Br.") at 1, Defendant Eckert does not dispute Mr. Hurley's qualifications or that the subject of his testimony is proper grounds for expert analysis. Nor could he. Instead, Defendant Eckert disputes the reliability of Mr. Hurley's opinions. *Id.* at 7.

## A. Mr. Hurley's Methods Were Reliable

Expert opinion should be admitted if "the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (internal quotation marks and alteration omitted). "*Daubert* is designed to eliminate 'junk science' from the courtroom—not to get rid of testimony from obviously qualified individuals that might have been better crafted." *Ramsay-Nobles v. Keyser*, No. 16-cv-5778, 2019 WL 4383187, at *14 (S.D.N.Y. Aug. 21, 2019) (denying *Daubert* motion to preclude the expert opinion of a former corrections supervisor similar to Mr. Hurley who was offering opinions similar to Mr. Hurley's).

### 1. Mr. Hurley Relied on His Extensive Correctional Experience

The Supreme Court has recognized that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire*, 526 U.S. at 156. For subjects like corrections practice, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150; *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[The] reliability [of non-scientific testimony] depends heavily on the *knowledge and experience* of the expert, ***rather than the methodology or theory behind it***.") (second emphasis added) (citation omitted).

In Section 1983 cases, courts routinely allow testimony by experienced experts in the field of corrections to explain standards of practice applicable to situations that confront

correctional staff, and to opine whether the conduct at issue met those standards. "Best correctional practices is a subject to which expert testimony is appropriately given. It is a subject with which the average juror is unfamiliar. Courts—including this Court—accept testimony about best correctional practices, like testimony about best police practices, routinely." *Ramsay-Nobles*, 2019 WL 4383187, at \*12. *See e.g.*, *Marria v. Broaddus*, 200 F. Supp. 2d 280, 287 & n.10 (S.D.N.Y. 2002).[3]

Here, Mr. Hurley's training and experience—including 36 years in corrections, half of which were in senior management positions, and past review of the documentary records associated with more than 12,000 uses of force in correctional settings—render him qualified to identify red flags in documentary records associated with the use of force and similar events, as well as the range of interventions available to a prison supervisor to mitigate those risks. Ex. Q; *Marria*, 200 F. Supp. 2d at 287-88 & n.10 (expert was qualified based on his "significant experience in corrections management," including past positions as the warden of prisons in both Virginia and Utah, and that his experience was a reliable basis for testimony "as to why, as a warden, he would not have" engaged in the particular conduct by facility supervisors at issue in the litigation).

---

[3] *See also Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996); *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 715 (6th Cir. 1992); *Parker v. Williams*, 855 F.2d 763, 777-78 (11th Cir. 1988); *Wade v. Haynes*, 663 F.2d 778, 783-84 (8th Cir. 1981), *aff'd on other grounds*, 461 U.S. 30 (1983); *White v. Watson*, No. 16-cv-560, 2018 WL 2047934, at \*13 (S.D. Ill. Sept. 10, 2018); *Bruner-McMahon v. Sedgwick Cnty. Bd. of Comm'rs*, No. 10-cv-2064, 2012 WL 33837, at \*9, \*18, \*24 (D. Kan. Jan. 6, 2012), *aff'd*, 566 F. App'x 628 (10th Cir. 2014); *Carter v. Cnty. of Santa Clara*, No. 05-cv-3974, 2008 WL 205597, at \*3 (N.D. Cal. Jan. 24, 2008); *Murphy v. Gilman*, No. 04-cv-103, 2006 WL 3613754, at \*8 n.2 (W.D. Mich. Dec. 11, 2006).

### 2. Mr. Hurley Reviewed an Extensive Record and Then Explained His Methodology and Opinions in a Reasoned Report

Mr. Hurley has explained the basis for his opinions in a detailed report. Mr. Hurley reviewed DOCCS use of force training materials, deposition transcripts, including of Lewalski and Defendant Eckert, Lewalski's unusual incident reports, Defendant Eckert's referrals of Lewalski to OSI, a summary chart of the Superintendent Grievance Tracking System showing grievances against Lewalski alleging staff misconduct, and other records. Exs. Q at 7; Ex. R at 85:21-86:13. Then, Mr. Hurley offered two opinions.

*First*, Mr. Hurley opined that there were red flags in Lewalski's record that suggested he posed a substantial risk of harm to inmates. Ex. Q at 6. Mr. Hurley reached this opinion by relying on his extensive training and experience reviewing the documentary records associated with more than 12,000 uses of force over the course of his career, his experience supervising thousands of staff, and his experience auditing prisons and correctional policies. To be clear, Mr. Hurley did not opine as to whether Lewalski used excessive or unlawful force in any specific incident. When Mr. Hurley described Lewalski as an "outlier," he was repeating what Defendant Eckert himself testified: that Lewalski was among the 3 of 800 staff members at Wende with the most uses of force. *Id.* at 7 (citing Defendant Eckert's deposition testimony).

But Mr. Hurley did opine that this record—showing the same staff member involved in frequent, serious uses of force, with significant injuries, and a pattern of grievances—is a red flag in correctional settings even if that staff member is never disciplined under the correctional department's policies. *See id.*; Ex. R at 38:24-39:23. Experienced supervisors such as Mr. Hurley and Defendant Eckert must assess risk and do what they can to mitigate it. And risk in this setting is not determined by the disposition of any single use of force in some DOCCS internal review. *See* Exs. Q at 10; R at 29-31. Mr. Hurley's opinion is that the pattern is what mattered,

10

and that Lewalski's pattern signaled that he posed a risk to people who were incarcerated at Wende. Similarly, Mr. Hurley's opinion is not contingent on Lewalski's participation in the use of force against Mr. Taylor. It just so happens that Mr. Taylor's experience fit a pattern of Lewalski's prior activities at Wende. There is no "Monday-morning quarterbacking," as Defendant Eckert charges. *See* Def.'s Br. at 6.

*Second*, Mr. Hurley opined that Superintendents are expected to take steps to ensure that their subordinates use force when necessary and in the minimum amount required. Exs. Q at 9 (citing Gary Klugiewicz, *Factors that influence the use of force in a correctional institution*, Police 1 (Feb. 7, 2008), https://www.police1.com/corrections/articles/factors-that-influence-the-use-of-force-in-a-correctional-institution-c6rcjkKeyUhR0Kr5/); F at 9:23-12:3. Mr. Hurley opined that based on his training and experience, there were a number of interventions that Defendant Eckert could have undertaken to influence Lewalski's behavior and mitigate the risk that he posed, none of which are prohibited by the CBA, and many of which were cited by Defendant Eckert himself in his own deposition. For example, Defendant Eckert identified the following ways to influence corrections staff behavior outside of the CBA: observing and correcting staff, training, mentoring, audits, counseling, instructing a supervisor to meet with an individual, temporarily stopping an employee from going to their tour of duty, and simply having a meeting with the staff member. *See, e.g.*, Exs. F at 13:2-16:25, 20:6-18; S at 140:18-141:2; 141:24-142:10.

Defendant Eckert and his expert witness, Matthew Bloomingdale, agree that these interventions do not violate the CBA. Ex. S at 168:2-169:5 ("[Superintendents] can do some of those [interventions], however, they are not required to do those things []."). Of course, Defendant Eckert could engage in the procedures set forth by the CBA to initiate discipline or

11

termination of Lewalski. But he had a variety of tools at his disposal that operated outside of that framework.

Finally, after reviewing the records in this case, including the deposition of Defendant Eckert, Mr. Hurley opined that Defendant Eckert did not actually do anything to mitigate the risk that Lewalski posed. Ex. Q at 9-10. For this opinion, Mr. Hurley relied on, among other things, Defendant Eckert's own testimony that the extent of his interaction with Lewalski in the prison was that they had "talked a little bit" about things like "how his day was going, anything going on. It was just usual daily banter," Ex. F at 207:1-14—and that they never discussed Lewalski's "performance as a sergeant," "use of force," or anything of the sort, *id.* at 207:13-19.

There is nothing controversial or improper about these modest expert opinions. "There is nothing wrong with [relying on experience]: the very text of Fed. R. Evid. 702 provides that an expert can be qualified on the basis of his 'knowledge, skill, *experience,* training, or education[.]'" *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015) (emphasis in original) (quoting Fed. R. Evid. 702). Contrary to Defendant Eckert's argument, Mr. Hurley did not take the facts of this case and "reverse engineer" a rubric for the purpose of assessing whether the defendants acted properly or not. *In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018). To the extent that Mr. Hurley relied on any rubric that was not formed by best correctional practices, it was how Defendant Eckert himself described what constitutes "red flags" in the context of risk of excessive force against inmates. *See, e.g.*, Ex. F at 28:15-23.

Defendant Eckert does not cite a single case where a Court precluded opinions similar to the ones offered by Mr. Hurley, a highly credentialed expert relying on his training and experience on a subject that called for such analysis. There is no basis in law or reason to

preclude his reliable opinions at trial. Defendant Eckert is free to test them at trial via cross examination.

**B.     Mr. Hurley Accounted for any Limiting Facts that Could Undermine His Opinions**

Defendant Eckert does not offer any "limiting facts" that Mr. Hurley did not consider and that call for modification of Mr. Hurley's opinions.

Mr. Hurley's analysis of Lewalski's "red flags" was based on the documentary information available to Defendant Eckert during the time between Defendant Eckert assuming the helm at Wende (where he supervised Lewalski) and Dante Taylor's death. It is not relevant whether Defendant Eckert and Lewalski had ever worked together prior to Wende, whether Defendant Eckert was ever specifically warned that Lewalski "was a problem," or the other litany of supposed "admissions" that Defendant Eckert trumpets in the corresponding section of his memorandum. *See* Def.'s Br. at 11-12. The actionable information about Lewalski that Defendant Eckert knew was all presented to Defendant Eckert during the ordinary course of business, when Eckert himself determined that Lewalski's uses of force were concerning under his own rubric and repeatedly referred them to OSI. Ex. F at 81:13-25. A pattern of using force can be probative of substantial risk even if the DOCCS Bureau of Labor Relations does not so find. Def.'s Br. at 12. This is precisely why expert testimony is required. *Veleron Holding, B.V.*, 117 F. Supp. 3d at  443 (S.D.N.Y. 2015) (emphasis in original) (quoting Fed. R. Evid. 702).

Mr. Hurley's identification of possible interventions took the CBA into account. Defendant Eckert and his expert witness agree. *See, e.g.*, Exs. F at 13:2-16:25, 20:6-18, S at 140:18-141:2; 141:24-142:10, 168:2-169:5 ("[Superintendents] can do some of those [interventions], however, they are not required to do those things []."). And while we will never know for sure whether any intervention that Defendant Eckert could have attempted would have

protected Mr. Taylor, Mr. Hurley certainly has the training and experience to opine to a reasonable degree of certainty as to whether such interventions are likely to influence an officer's behavior, and a reasonably jury could easily conclude that Defendant Eckert's failure to do any single thing was a flagrant disregard of the risk that Lewalski posed.

**C.** **Lewalski Posed a Risk of Harm to People Incarcerated at Wende, Including Mr. Taylor**

Lewalski's red flag conduct—like a ticking time-bomb—posed a risk of serious harm to all inmates at Wende who came into contact with him, including but not limited to Mr. Taylor. Defendant Eckert does not cite a single case for his claim that Mr. Hurley cannot opine on Lewalski's risk to inmates at Wende generally, and can only opine about risk to Mr. Taylor specifically (even though he is an inmate at Wende). *See* Def.'s Br. at 14-15.

Nevertheless, while it is not required as a matter of law, Mr. Hurley did offer at least one indication that the risk that Lewalski posed to Mr. Taylor was elevated among other inmates. The record in this case shows that on October 5, 2017, a non-party, female corrections officer was injured after slipping on water outside Mr. Taylor's cell, and that rumors of this event were circulating throughout the prison. Ex. R at 179:15-180:21, 181:20-25.  The record also shows that Lewalski repeatedly used extreme force against inmates who had been accused of breaking prison rules in incidents that frequently sent the inmate to the outside emergency room. *See* Exs. G-P. Mr. Hurley opined based on his training and experience that the risk of retaliation— especially following injury to a female corrections officer by an inmate—is acute and common. Ex. R at 241:3-242:4.

Mr. Hurley's opinion that Lewalski posed a risk of harm to Mr. Taylor and others is sufficiently reliable to merit presentation to the jury. It relies on application of his specific and extensive training and experience, and self-evidently deductive reasoning. Defendant Eckert does

not cite a single case where a Court precluded opinions similar to the ones offered by Mr. Hurley. His motion should be denied.

## II. MR. HURLEY'S OPINIONS DO NOT UNFAIRLY PREJUDICE DEFENDANT ECKERT OR ANYONE ELSE

"Expert testimony is subject to Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, No. 08-cv-6256, 2012 WL 6628878, at *4 (W.D.N.Y. Dec. 19, 2012) (quoting Fed. R. Evid. 403). Plaintiff claims that Defendant Eckert was deliberately indifferent to the extreme risk that Lewalski posed to inmates at Wende and Mr. Taylor over the use of excessive force. Defendant Eckert argues that this claim is "predicated on some wrongdoing by Lewalski," and that discussing Lewalski's record of using force would somehow unfairly prejudice Defendant Eckert or one of his other co-Defendants. Not so.

As a threshold matter, Defendant Eckert is liable for failing to mitigate the risk posed by Lewalski irrespective of whether DOCCS or OSI had determined that each individual use of force predating Mr. Taylor's death adhered to DOCCS policies and procedures. As Mr. Hurley will explain to the jury, corrections staff have wide discretion in how to fulfill their responsibilities, and there are techniques that they can employ to reduce the need to use force at all, or at the very least, force that sends an inmate or officer to the emergency room. It is entirely possible that for every single one of the dozen of Lewalski's uses of force on Defendant Eckert's watch—almost half of which resulted in an inmate being sent to the emergency room and almost half of which Eckert himself referred to OSI—that Lewalski was operating within the technical confines of DOCCS polices but still inappropriately exacerbating the risk of violence. It is for this very reason that such interventions as additional training or having a discussion with

Lewalski about his uses of force could have been meaningful. Defendant Eckert's memorandum seems to misapprehend this fundamental tenet of corrections supervision. This is precisely the reason why the jury must hear expert testimony on this subject.

Defendant Eckert testified at length about the rubric he employed to evaluate staff conduct, and whether documentation concerning the use of force contained "red flags" that merited intervention. He testified at length about how Lewalski's use of force record was replete with red flags, and how and why he referred Lewalski to OSI—every five months, which represented 66% of all of Defendant Eckert's referrals to OSI across his 800-person staff. Defendant Hurley puts these facts in the context of correctional practices. All of this is fair game for presentation to the jury at trial and certainly not inappropriately prejudicial.

To the extent that Lewalski has some objection to the presentation of this evidence in Plaintiff's case against Defendant Eckert, Defendant Lewalski is free to move *in limine* or at trial for a limiting instruction, as has been done in other cases with similar fact patterns. He apparently decided not to move under *Daubert*.

But these are certainly not grounds to preclude Mr. Hurley's testimony in its entirety, as Defendant Eckert seeks. The Court—and later, the jury—should have the opportunity to consider Mr. Hurley's expert opinion. Without it, both would be left without a counterbalance to Defendant Eckert's self-serving recount of sound correctional practices and supervision. Defendant Eckert's motion should be denied.

## CONCLUSION

Defendant Eckert's motion to prevent Mr. Hurley from participating in this case should be denied.

Dated: May 23, 2025
New York, New York

16

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


/s/ *Katherine Rosenfeld*
Katherine Rosenfeld
Daniel M. Eisenberg
Eric Abrams

One Rockefeller Plaza, 8th Floor
New York, New York 10020

(212) 763-5000

*Attorneys for Darlene McDay*

17