UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DARLENE McDAY, as Executrix of the Estate
of DANTE TAYLOR,

                Plaintiff,

-against-

STEWART ECKERT, Superintendent, Wende
Correctional Facility, et al.,

                Defendants.

Case No. 20 Civ. 0233 (JLS) (JJM)

**Oral Argument Requested**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT STEWART ECKERT'S MOTION FOR SUMMARY JUDGMENT**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

PRELIMINARY STATEMENT ....................................................................................1

FACTS ........................................................................................................................3

      A.      Defendant Eckert Monitored "Red Flags" Among Officers at Wende........4

      B.      Lewalski's Red Flags........................................................................................5

            1.      Use of Force Against Inmates Following "Surprise Attacks" .........6

            2.      Repeated Referrals to Internal Affairs .............................................8

            3.      Grievances, Insubordination, and Discipline .................................12

      C.      Defendant Eckert Had the Ability to Influence Lewalski's Behavior .......14

      D.      Defendant Eckert Did Nothing to Mitigate the Risk of Harm to Inmates by Lewalski.........................................................................................................15

ARGUMENT..............................................................................................................17

    I.      DEFENDANT ECKERT HE KNEW THAT LEWALSKI POSED AN EXCESSIVE RISK OF HARM TO INMATES BUT DID NOTHING TO ABATE IT ......................................................................................................18

      A.      Defendant Eckert Knew that Lewalski Posed an Excessive Risk of Harm to Inmates....................................................................................................19

      B.      Defendant Eckert Disregarded the Risk of Harm that Lewalski Posed .....22

    II.      DEFENDANT ECKERT IS NOT ENTITLED TO QUALIFIED IMMUNITY ..23

CONCLUSION...........................................................................................................25

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 17

*Blissett v. Coughlin*,
66 F.3d 531 (2d Cir. 1995) ...................................................................................... 24

*Colon v. Coughlin*,
58 F.3d 865 (2d Cir. 1995) ...................................................................................... 25

*Cooper v. Sheahan*,
No. 12-CV-1227S, 2022 WL 2974029 (W.D.N.Y. July 27, 2022) ........................... 19, 21

*Edwards v. Quiros*,
986 F.3d 187 (2d Cir. 2021) ...................................................................................... 22

*Farmer v. Brennan*,
511 U.S. 825 (2d Cir. 1994) ...................................................................................... 18, 24

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
22 F.3d 1219 (2d Cir. 1994) ...................................................................................... 18

*Gibson v. Cuomo*,
No. 20-CV-1455, 2023 WL 3793989 (W.D.N.Y. Mar. 28, 2023) ................................. 24

*Glover v. Doe*,
No. 22-CV-06104, 2022 WL 2718508 (W.D.N.Y. July 13, 2022) ................................ 21

*Gonzalez v. City of Schenectady*,
728 F.3d 149 (2d Cir. 2013) ...................................................................................... 24

*Lennon v. Miller*,
66 F.3d 416 (2d Cir. 1995) ...................................................................................... 24

*Livingston v. Rivera*,
No. 94-CV-5319, 1999 WL 26902 (E.D.N.Y. Jan. 20, 1999) ...................................... 26

*Lopez v. Chappius*,
No. 6:17-CV-06305, 2023 WL 2612507 (W.D.N.Y. Mar. 23, 2023) ............................ 18

*Mitchell v. Chappius*,
750 F. Supp. 3d 123 (W.D.N.Y. 2024) ...................................................................... 21

*Morgan v. Dzurenda*,
No. 3:14-CV-966, 2017 U.S. Dist. LEXIS 48445 (D. Conn. Mar. 31, 2017) ................. 25

*Nicholas v. Tucker*,
    89 F. Supp. 2d 475 (S.D.N.Y. 2000)................................................................ 24

*Percinthe v. Julien*,
    No. 08-CV-893, 2009 WL 2223070 (S.D.N.Y. July 24, 2009) ....................................... 24

*Ramsay-Nobles v. Keyser*,
    No. 16-CV-5778, 2019 WL 4383187 (S.D.N.Y. Aug. 21, 2019)............................... 21, 22

*Reeves v. Sanderson Plumbing Products., Inc.*,
    530 U.S 133 (2000)................................................................................. 17

*Salahuddin v. Goord*,
    467 F.3d 263 (2d Cir. 2006)........................................................................ 22

*Stephens v. Venetozzi*,
    No. 13-CV-5779, 2016 U.S. Dist. LEXIS 24123 (S.D.N.Y. Feb. 24, 2016).................... 25

*Taggart v. Time, Inc.*,
    924 F.2d 43 (2d Cir. 1991)........................................................................ 17

*Tangreti v. Bachmann*,
    983 F.3d 609 (2d Cir. 2020)................................................................. passim

*Vega v. Semple*,
    963 F.3d 259 (2d Cir. 2020)........................................................................ 18

**Statutes**

42 U.S.C. § 1983.............................................................................. 22, 24, 25

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................. 17

Plaintiff Darlene McDay as Executrix of the Estate of Dante Taylor opposes Defendant Stewart Eckert's motion for summary judgment (ECF No. 323).

**PRELIMINARY STATEMENT**

On October 6, 2017, the Corrections Officer Defendants,[1] led by Defendant Sergeant Timothy Lewalski ("Lewalski"), attacked 21-year-old Dante Taylor in his cell at Wende Correctional Facility ("Wende") in retaliation for past, perceived rule infractions. They left Mr. Taylor battered and disfigured. He died by suicide shortly after returning to the prison from the outside emergency room. Defendant Stewart Eckert was the Superintendent of Wende at the time, and he had already determined that Lewalski's conduct in the prison created a high risk of excessive force against people incarcerated at Wende, including Dante Taylor.

Defendant Eckert was a veteran Department of Corrections and Community Supervision ("DOCCS") Superintendent and supervisor when he took command of Wende in 2015. In the sixteen months between his appointment as Superintendent of Wende and Dante Taylor's death, two-thirds of all of Defendant Eckert's referrals to DOCCS internal affairs (the Office of Special Investigations, or "OSI") involved Lewalski. Defendant Eckert referred Lewalski's uses of force to OSI every five months. Lewalski was involved in one serious use of force against an incarcerated person almost every month. Almost 50% of Lewalski's uses of force sent an inmate to the local emergency room. Even years since leaving his post at Wende, Defendant Eckert recalled that Lewalski was in the "top three" of staff members there with the highest uses of force, and the only one of the three that Defendant Eckert could recall by name. Lewalski was in a class of his own among the approximately 800 employees under Eckert's supervision.

---

[1] The Officer Defendants are Timothy Lewalski, Melvin Maldonado, Thomas White, James Horbett, Dylan Janis, and Kelly McDonald.

In the vast majority of Lewalski's uses of force during Defendant Eckert's tenure at Wende, Lewalski alleged that inmates had launched surprise, unprovoked attacks on staff, which purportedly justified officers' use of force—and, in some cases, grievous bodily harm—in response. Lewalski broke his baton on an inmate's legs. He supervised officers' assault of an inmate who was handcuffed and facing the wall. He used force against an inmate complaining about his missing chess board. And uses of force would tend to begin just as officers escorting an inmate entered areas of the prison monitored by Lewalski. The record in this case shows that Lewalski fashioned himself the prison's vigilante enforcer, sending inmates to the emergency room when he deemed it appropriate.

Defendant Eckert knew all of this. He read the use of force reports. He identified and understood the risks Lewalski posed to inmates. He admitted as much in his deposition. But aside from making a few referrals to OSI—where Defendant Eckert himself documented what he later described as "red flags"—Defendant Eckert did nothing else. While the OSI referrals demonstrate Defendant Eckert's knowledge of Lewalski's risks, they were not an intervention that would have any immediate impact, if any. Defendant Eckert knew that OSI investigations took months or years to resolve, and that any employment discipline would take additional months or years to resolve. In light of this disturbing record, referring Lewalski to OSI without doing anything more was just kicking the can down the road and choosing to do nothing to address the imminent risk to inmate safety.

If Defendant Eckert had rolled up his sleeves and done even a cursory review of Lewalski's employment history—particularly warranted given the "red flags" he identified from the records he did review—he would have seen that Lewalski averaged more than 25 unusual incident reports per year since 2014, and had been cited for insubordination, sued, and accused of

staff misconduct by inmates. There were many obvious indications that Lewalski's use-of-force tear in 2016 and 2017 was part of a long-established pattern. Yet it was clear to everyone in the prison that Defendant Eckert—the top of Lewalski's chain of command—had made a conscious decision to stick his head in the sand, even when he knew better. When Lewalski was asked in his deposition, "What involvement did [Defendant Eckert] have with you as a supervisor, if any?" Lewalski responded: "Not a whole lot from what I recall."

At all relevant times, Defendant Eckert was, in his own words, the Chief Executive Officer of Wende, and "the buck stop[ped] with [him]." However, he is liable for his failure to protect Mr. Taylor from Lewalski not because of the position that he held, but because of his personal involvement in reviewing Lewalski's use of force record, determining that it raised deeply concerning red flags, and then deciding to not do anything to safeguard inmates from a violent, uncontrolled Sergeant under his command.

Defendant Eckert's motion for summary judgment relies on his post-hoc, self-serving characterization of disputed facts, which, of course, cannot serve as the basis for the relief he seeks. It is for the jury to decide whether, on this record, Lewalski posed a risk of serious harm to all Wende inmates, including Mr. Taylor; whether Defendant Eckert knew of and disregarded that risk; and whether Defendant Eckert had any ability, but failed, to mitigate that risk. His motion should be denied so that the jury can decide whether Defendant Eckert's version of the facts carries the day—or not.

## FACTS

On May 17, 2016, Defendant Stewart Eckert was appointed Superintendent of Wende Correctional Facility, a New York State prison located in Erie County with approximately 800 corrections and civilian staff. Eckert Statement of Undisputed Facts ("SUF"), ECF No. 323-15, ¶¶ 14, 19. This role is akin to "Chief Executive Officer," where the Superintendent is responsible

for the safety and security of staff and inmates alike, and is "ultimately responsible for what happens in the prison." Ex. A (May 31, 2024 Tr. of Stewart Eckert Dep. ("Eckert Dep. Tr.")) at 10:25-11-25.[2] The "buck stops with [him]." *Id.* at 12:1-2. Defendant Eckert came to Wende as a deeply experienced DOCCS official. Serving as Superintendent of Wende was Defendant Eckert's penultimate position at DOCCS over the course of a 39-year career. *See* SUF ¶¶ 11-12.

A.       **Defendant Eckert Monitored "Red Flags" Among Officers at Wende**

Defendant Eckert had the authority to issue facility-level directives as to how Wende would implement DOCCS policy, was responsible for monitoring Wende's security staff's compliance with DOCCS rules and policies, and regularly reviewed reports of staff uses of force against inmates and associated documentation, such as medical records, to assess whether staff appeared to comply with DOCCS directives. *See id.* ¶¶ 22, 23, 31. Defendant Eckert understood that it was part of his job to assess whether there was "an employee that may be headed down a bad road or that has become problematic and corrective action may be necessary." Ex. A at 25:15-22. Defendant Eckert was responsible for, in his own words, identifying "red flags" in staff behavior that merited scrutiny, and, when appropriate, intervention. *Id.*

Defendant Eckert drew from a variety of tools to monitor corrections staff for the purpose of determining whether they posed an inappropriate risk to inmate safety. He reviewed inmate grievances, use of force reports, unusual incident reports, human resources files, discipline documentation, and lawsuits if he became aware of them. *Id.* at 47:9-17. He would use his extensive training and experience to assess whether an officer's conduct described therein could be a "red flag." *Id.* at 29:3-32:23, 42.

According to Defendant Eckert, "red flags" in the context of excessive force included:

---

[2] "Ex." refers to Exhibits to the Eisenberg Declaration, submitted contemporaneously with this memorandum of law.

patterns in inmate grievances (even if each individual grievance was not meritorious), patterns in unusual incident reports (in particular, if the same officer was repeatedly involved), whether an individual incident or series of incidents resulted in serious injuries to the staff or inmate, inconsistencies among staff reports compared to an incarcerated person's account, and whether the injuries matched the staff account. *Id.* at 29:3-32:23, 42. Defendant Eckert testified that he reviewed use of force and similar reports with the purpose of searching for "red flags." *Id.* at 44:14-47:17. Further, to the extent that Defendant Eckert needed more information about an officer who required additional scrutiny in deciding whether and how to mitigate that officer's risk, Defendant Eckert testified that he had the ability to review that officer's background, such as "past behaviors," his human resources file, disciplinary history, prior unusual incident reports, and prior inmate grievances, which could help him form a more fulsome picture of what was happening, including before Defendant Eckert took the helm at Wende. *See id.* at 21:4-26:24.

**B.  Lewalski's Red Flags**

Lewalski's track record concerning the use of force shot up numerous red flags under Defendant Eckert's own rubric for assessing risk to inmates, not only because he had the "top three" number of uses of force at Wende. Ex. A at 46:7-12 ("Q. While you were at Wende, which staff member had the highest number of uses of force? A. I don't know. Q. Could you tell me like the top three? A. Certainly I would think Sergeant Lewalski would have been one of them."). It is "rare" in the field of corrections for a single officer to have a comparable record, particularly in light of "the level of injuries, the frequency of injuries, concerns maybe that Eckert also identified []." Ex. B (Oct. 29, 2024 Tr. of Patrick Hurley Dep. ("Hurley Dep. Tr.")) at 234:15-235:15). Almost 50% of Lewalski's uses of force during this period sent an inmate to the emergency room. *See* Exs. A at 81:13-25; C-L.

**1. Use of Force Against Inmates Following "Surprise Attacks"**

The following is a timeline and summary of all of the "unusual incident" reports

submitted to Defendant Eckert where Lewalski was involved in a use of force against an inmate

during the time period between Defendant Eckert's becoming Superintendent of Wende and

Dante Taylor's death. Many of them show a pattern of Lewalski using or supervising force

following an inmate's purportedly surprise attack on staff. There is approximately one serious

use of force every other month, and sometimes more frequent uses of force than that.

- May 23, 2016: Lewalski involved in use of force against an inmate who allegedly struck an officer without warning during an escort. Ex. C (DOCCS000161-166, DOCCS000167-172, DOCCS001129-1132).
- June 9, 2016: Lewalski involved in use of force against an inmate under suspicious circumstances who sustained serious injuries and required treatment at the local emergency room. Ex. D (DOCCS000173-187,1133-1137).
- July 13, 2016: inmate allegedly struck Lewalski without warning, and Lewalski and other officers responded with significant force that included Lewalski breaking his wooden baton while smashing the inmate's legs. The inmate required treatment at the local emergency room. Ex. E (DOCCS000685-700, DOCCS001140-1143).
- November 20, 2016: inmate allegedly struck an officer without warning during a pat frisk, and Lewalski and others responded by using force. Inmate suffered dislocated left elbow and nasal fracture, and required treatment at the local emergency room Ex. F (DOCCS000701-712, DOCCS001144-1147).
- January 13, 2017: inmate allegedly struck an officer without warning during a pat frisk, and Lewalski and others responded by using force. Ex. G (DOCCS000713-728, DOCCS001148-1151).
- January 29, 2017: inmate "took an aggressive stance" towards officers without warning during an escort, and Lewalski and others responded by using force. Ex. H (DOCCS745-762, DOCCS1156-1160).
- February 9, 2017: Lewalski and others used force against an inmate seeking his missing chess board. Ex. I (DOCCS000763-793, DOCCS001161-1170).

6

- April 30, 2017: inmate allegedly shoved an officer without warning and Lewalski responded by using force. Ex. J (DOCCS000578-588, DOCCS001171-1174).
- May 1, 2017: inmate allegedly turned without provocation and struck Lewalski, who used force in response, including multiple baton strikes that caused a scalp laceration and injuries to inmate's legs. Inmate required treatment at local emergency room. Ex. K (DOCCS000794-811, DOCCS001175-1180).
- October 6, 2017: Lewalski and others used force on an inmate who was already in handcuffs and facing the wall when the inmate suddenly and without warning allegedly struck an officer using the back of his head. Ex. L (DOCCS000831-842, DOCCS001191-1194).

On October 6, 2017, the date of the incident that gave rise to this litigation, Dante Taylor was reportedly having a seizure in his cell. Lewalski and other officers responded, and Mr. Taylor endured "numerous" "blunt force injuries" to his "head (and neck)," "torso," and "extremities," Ex. M (OSI000550-570), which the Medical Examiner described as "concerning for inflicted injuries (i.e., not-self-inflicted)," *id*. at OSI000558. The officers left Mr. Taylor battered and disfigured. *Id*.; Ex. N (PA060015, PA060007). Mr. Taylor died by suicide the following day after returning to the prison from the local emergency room. Ex. M (OSI000557-558). This assault on Mr. Taylor was in retaliation for a prior perceived infraction. Exs. O (Mar. 28, 2023 Tr. of Jillian Freeman Dep. ("Freeman Dep. Tr.") at 40:3-41:25), P (Dec. 12, 2023 Tr. of Timothy Lewalski Dep. ("Lewalski Dep. Tr.") at 75:9-77:6), Q (OSI000007).

Following Mr. Taylor's death, Lewalski was involved in at least three other incidents where he and other officers used force against inmates. *See* Exs. R (DOCCS000843-858, 1195-1201); S (DOCCS000874-886); T (DOCCS000493-504, DOCCS001212-1217). In one use of force approximately three weeks after the one involving Mr. Taylor, Lewalski struck an inmate multiple times in the back and lower legs. Medical staff documented several abrasions on the

7

inmate's face, arms, and body, multiple lacerations, including above his eyelid and to the right of his chin, and swelling. The inmate was taken to the emergency room. *See* Ex. R.

Lewalski retired from DOCCS on or about 2020, following a one-week disciplinary suspension and one-year disciplinary evaluation period for insubordination. Exs. U (DOCCS Subpoena Resp. 000001), V (PL002333) ("[W]e note your prior discipline history and a pattern of misconduct that represents a willful disregard for supervisory staff direction which was designed to enforce policy related to facility safety and security").

### 2. Repeated Referrals to Internal Affairs

Of the at least 10 instances where Lewalski used force against inmates at Wende during Defendant Eckert's tenure, Defendant Eckert referred almost 50% of them to OSI. *See* Exs. A at 81:13-25, C-L. These referrals represented almost two-thirds of all referrals for all staff that Defendant Eckert made to OSI during this period. *See* Ex. A at 81:13-25.

*First*, on June 8, 2016, inmate Darius Saunders was accused of threatening a staff member. Instead of transporting him to the Special Housing Unit that very day for his disciplinary sanction, per protocol, officers at Wende locked him in his cell and waited until the following day for the transport. Exs. D, A at 65. Then, during the transport, officers accused Mr. Saunders of trying to pull his hands away from them to avoid handcuffs, and the officers then responded with extreme force, causing swelling and bruises to his head and splitting open his shin, among other injuries. Exs. D, A at 65. Mr. Saunders' injuries required treatment at the local emergency room. Exs. D, A at 65.

Defendant Eckert testified that he was "concerned by the injuries" to Mr. Saunders under these circumstances and believed that the delay in escort was a "red flag." Ex. A at 71:1-72:2. When asked why, Defendant Eckert explained: "[the] wait to escort [] gave me a red flag that they were possibly waiting for somebody in particular to do the escort." *Id.* at 71:1-13. And the

8

following day, June 9, 2016, which officer showed up to supervise the escort? It was Lewalski. After reading the report of this incident—written by Lewalski himself—Defendant Eckert referred it to OSI for investigation and—despite knowing that the investigation (and disciplinary proceedings, if any) would take months or years—did nothing further. Ex. D.

*Second*, on January 29, 2017, inmate Patrick Pugh allegedly fought with another inmate. Exs. H, A at 72:24-74:23. Afterwards, officers searched Mr. Pugh's cell, and one of them purportedly cut his thumb on a hidden blade. While escorting Mr. Pugh to medical, the escort entered an area where Lewalski was stationed. Then, Mr. Pugh allegedly, and without warning, "took an aggressive stance" towards an officer. Lewalski and the officers responded by using force against him, taking him to the floor. Defendant Eckert referred this case to OSI because "circumstances involved in this incident require additional investigation." Ex. H. In his deposition, Defendant Eckert could not recall why he referred this case to OSI but did testify that it could have been due to concerns about "retaliation," "inmate injuries," or some other factor. Ex. A at 76:22-77:9.

*Third*, on May 1, 2017, inmate Dwayne Dailey was complaining about his missing chess board. Then, he purportedly "suddenly turned and struck Sgt. Lewalski . . . with a closed left fist," and Lewalski and other officers struggled with Mr. Dailey and restrained him. Ex. K (DOCCS000794-796). During this altercation, Lewalski struck Mr. Dailey with his baton "multiple times in the back and shoulder . . . [and] arms." *Id.* at DOCCS000795. A medical examination of Mr. Dailey afterward identified lacerations to his head, scalp, and arm; swelling to his cheek and forehead; and an abrasion on his elbow. *See id.* at DOCCS000801. Mr. Dailey was taken to the local emergency room. Defendant Eckert referred his incident to OSI "due to inconsistancy [sic] in staff reports, inmate interview and inmate injuries." *Id.*

*Fourth*, on October 6, 2017, inmate Adell Zeigler was being escorted from his cell to the Special Housing Unit for a previous alleged violation of departmental rules. Exs. L at DOCCS000831, A at 78:24-80:24. He was placed in "mechanical wrist restraints" prior to exiting his cell and then escorted to an area of the prison where Lewalski was on duty as the supervisor. Ex. L at DOCCS000831. Once the escort arrived in Lewalski's area, the officers decided to pat frisk Mr. Zeigler, at which point Mr. Zeigler allegedly "turned suddenly and assaulted [a CO] by striking him on the chest with his head." *Id*. Officers knocked Mr. Zeigler "face first into the wall and then face first to the floor," and then landed on top of him. *Id.* at DOCCS000831, DOCCS000838. Mr. Zeigler was still handcuffed the whole time. *Id.* at DOCCS000836. Defendant Eckert reviewed and evaluated the case. He referred it to OSI "due to inmate being in restraints and [inmate's lack of] disciplinary history." Exs. A at 80:3-8, L at DOCCS000836.

*Fifth* was Defendants' assault on Mr. Taylor on October 6, 2017—the same day as Lewalski's assault on Mr. Zeigler. Defendants, including Lewalski, reported to Mr. Taylor's cell in response to a call for a medical emergency—that Mr. Taylor was having a seizure. Mr. Taylor was not flailing or thrashing around, but rather "was laying on his bed, he kind of like had his arm stiff in the air" and was "kind of twitching." Ex. W at 42. Mr. Taylor was a danger to no one—not to the officers, and not to himself—as he was frozen and unresponsive to the officers trying to talk to him: "when they did this, he sat up on his bed with the -- and he was just staring at the wall when he sat up on his bed." *Id*. at 40. Lewalski and other Defendants entered Mr. Taylor's cell, tackled him to the floor, and proceeded to beat Mr. Taylor, including with batons. *Id*. at 37, 43:9-22, 45:2-26. "[T]hey were restraining him, that's when they kind of start to attack him. They were jabbing him in his –his upper shoulder areas with their batons." *Id.*

10

To escape the blows, Mr. Taylor tried "to wiggle away from them" and hide under his bed. *Id*. The incarcerated people close to Mr. Taylor's cell heard him getting hit, and while being beaten, heard officers "making fun of him," saying that Mr. Taylor was "in la la land." Ex. X at 54:3-25. Mr. Taylor could not escape under his bed. "So then they pulled him from—they got him from under the bed. And they—they continued to jab at him, you know, his upper shoulder area with the batons." Ex. W at 45:23-6. "While he was on the floor and when he—when they pulled him from under the bed, they were punching him. . . . the officers that were on his arms— officers that had his arms were trying to restrain by his arms [and] were punching him in his face. The other officers were kind of punching him in his back and his sides." *Id*. at 63:19-64:9. Mr. Taylor began screaming in pain. *Id*. at 46:8-12, 51:1-8. "So he starts screaming. He couldn't even speak so now he's screaming." Ex. X at 54:14-15. "I knew that they were hurting him because of the way—the sounds that he was making." Ex. W at 51:1-8.

"And then [Mr. Taylor] stopped making any sound," *id*. at 46:11-12. "Then eventually the screaming stopped." Ex. X. at 54:21-23. Despite having beaten Mr. Taylor unconscious, incarcerated people "[h]eard a couple more—(Indicating)—hits." *Id*. Mr. Taylor "wasn't responsive. He wasn't yelling no more." *Id*. at 54:23-55:2. "So you had two officers on his legs, two officers on his arms, and he was face down. But he wasn't moving, he wasn't making any sound." Ex. W at 46:13-18. The assault lasted approximately ten minutes. *Id*. at 77:10-14.

Following Mr. Taylor's death, Dr. Tara Mahar, M.D., Chief Medical Examiner of the Erie County Office of the Medical Examiner, conducted an autopsy of Mr. Taylor's body. Ex. M (Autopsy Report). Dr. Mahar examined the various "blunt force injuries" to Mr. Taylor's body, including to his "head (and neck)," *id*. at OSI000552, his "torso," and "extremities," *id*. at OSI000553. Among her various observations, Dr. Mahar stated: "Also present at autopsy were

11

numerous recent blunt injuries of the head, torso and extremities, particularly on the right side of the body. Some of these injuries, while not lethal, are concerning for inflicted injuries (i.e., not self-inflicted) . . ." *Id.* at OSI000558 At her deposition, Dr. Mahar testified that Mr. Taylor's injuries were caused by "blunt force trauma" which would be "likely" be attributable to "multiple punches and kicks and strikes." Ex. Y at 73:3-24. She also explained her characterization of the injuries as not self-inflicted, testifying repeatedly that Mr. Taylor's injuries would be "unusual" for a self-inflicted injury. *See, e.g.*, *id.* at 89:9-16 ("You know, the injuries in this case, the totality of the injuries were also rather planar. What I mean is that, like, they were more on the right side of the body, which is unusual to me in cases where there is self-injury and that I've seen cases like that before. They tend to be more widespread"), 90:9-18 (regarding "left groin area injury," testifying that "[i]t's also an unusual location for a self-inflicted injury. The pattern is consistent with being inflicted by like a long cylindrical object.").[3]

### 3.     Grievances, Insubordination, and Discipline

In addition to the unusual incident reports and OSI referrals discussed above, four inmate grievances against Lewalski during Defendant Eckert's tenure were coded "staff misconduct," all of which were reviewed by Defendant Eckert and logged on a DOCCS platform called the "Superintendent's Tracking System." Ex. Z (DOCCS000060). The two grievances preceding Mr. Taylor's death alleged a "[s]taff [a]ssault" and being "[h]it in the [h]ead" respectively. Ex. Z.

If Defendant Eckert had decided to review the portion of Lewalski's file that predated Defendant Eckert's tenure at Wende (which was warranted, given Lewalski's documented red

---

[3] About three weeks after Mr. Taylor's death, Defendant Eckert referred yet another Lewalski use of force to OSI. In that use of force, discussed above, Lewalski struck an inmate multiple times in the back and lower legs. Medical staff documented several abrasions on the inmate's face, arms, and body, multiple lacerations, including above his eyelid and to his right chin area, and swelling. The inmate was taken to the emergency room. *See* Ex. R.

flags during Eckert's tenure), he would have discovered that Lewalski had been involved in 103 unusual incidents—many including the use of force—between 2014 and 2018, with an average of more than 25 per year and more than two per month. *See* Ex. AA (DOCCS00064-64). Defendant Eckert would have also seen that supervisors had charged Lewalski with insubordination and/or falsification of records three times. Ex. U. In 2002, Lewalski was counseled by a Sergeant for writing "unprofessional, [] discourteous and insubordinate" comments in response to an evaluation he received. Some of the comments included the following statement (Ex. BB):

> Every night I pray to God that the inept supervision at all levels in this facility will not prevail in my downfall or the downfall of a fellow officer. Unfortunately, it is not a matter of if, but when one of us will be seriously injured or even killed, and the powers at be will plead ignorance.

In 2004, Lewalski received a Notice of Discipline for obtaining sick leave benefits for one week based on an altered doctor's note and false time card, but that Notice of Discipline was withdrawn six months later. Ex. U.

In 2015, Lewalski joined the Oath Keepers. *See* Ex. P at 282:3-18. According to Wikipedia, the Oath Keepers are a "far-right anti-government militia" that "encourages its members to disobey orders which they believe would violate the U.S. Constitution."[4]

In 2020, Lewalski received and Notice of Discipline for insubordination to a superior, refusing a direct order, and submitting false statements in a to/from memo. *See* Ex. U. As a penalty, he received a one-week suspension and 12-month disciplinary evaluation period. *Id.* In assessing the proposed penalty, the Department of Corrections stated (Ex. V):

> [W]e note your prior discipline history and a pattern of misconduct that represents a willful disregard for supervisory staff direction

---

[4] *Oath Keepers*, Wikipedia (last visited May 20, 2025), https://en.wikipedia.org/wiki/Oath_Keepers.

which was designed to enforce policy related to facility safety and security. Your actions are contrary to the expectations and duties of a Correction Sergeant of the Department and are a detriment to the safety and security of the facility.

### C. Defendant Eckert Had the Ability to Influence Lewalski's Behavior

The Superintendent of a prison is responsible for the tone, the culture, and the safety and security of the prison and inmate population. *See* Ex. A at 10:19-11:21. Superintendents are expected to take steps to ensure that their subordinates use force only when necessary and in the minimum amount required. *See* Exs. A at 9:23-12:3, CC (Expert Report of Patrick Hurley) at 9 (citation omitted). And given his position of unmatched authority in the prison, Defendant Eckert had a variety of ways to alter staff behavior, particularly when it came to concerns over excessive or inappropriate use of force, ranging from the lowest form of intervention—the mere fact of a Superintendent taking an interest in a subordinate's behavior (let alone expressing such interest to the subordinate)—to the highest form, such as initiating the processes to have that officer's employment terminated. *See* Exs. A at 9:23-12:3, B at 239:5-240:9, CC.

Of course, Defendant Eckert could engage in the procedures set forth by the Collective Bargaining Agreement ("CBA") to initiate discipline or termination of Lewalski's employment. But he also had a variety of tools at his disposal that operated outside of that framework. In his deposition, Defendant Eckert identified the following ways to influence corrections staff behavior, unrelated to the CBA: observing and correcting staff, training, mentoring, audits, counseling, instructing a supervisor to meet with an individual, temporarily stopping an employee from going to their tour of duty, and simply having a meeting with the staff member. *See, e.g.*, Exs. A at 13:2-16:25, 20:6-18, EE (Nov. 11, 2024 Tr. of Matthew Bloomingdale Dep. ("Bloomingdale Dep. Tr.") at 140:18-141:2, 141:24-142:10. Defendant Eckert's expert witness agrees that these interventions do not violate the CBA. Ex. DD (Bloomingdale Dep. Tr.) at

168:2-169:5 ("[Superintendents] can do some of those [interventions], however, they are not required to do those things [].") When the Superintendent took notice of an officer's concerning behavior—and actually did something about it—that mattered, and could help mitigate the risks of that behavior. *See* Ex. B at 239:5-240:9.

### D. Defendant Eckert Did Nothing to Mitigate the Risk of Harm to Inmates by Lewalski

Defendant Eckert admitted in his deposition that each of the unusual incidents he referred to OSI involving Lewalski were concerning to him. He testified:

> Q. It sounds like you have – here you have a collection of unusual incidents involving Sergeant Lewalski that raise some sort of concern for you, fair?
>
> A. Each individual incident at the time, correct.
>
> Q. Okay. And [. . .] you responded to that concern by referring them to OSI?
>
> A. Correct.

Ex. A at 82:16-83:1. But he did not do anything other than make these OSI referrals, *id.* at 83:2-3. ("Q. And did you do anything else? A. Not that I recall."), despite knowing full well that the OSI process takes months or years to resolve, *id.* 199:11-20 ("Q. I guess the concern here is future looking, right? So, you know, you—it takes many months or potentially years for an OSI investigation to conclude, fair? A. Fair. Q. And even after that, there's disciplinary proceedings and Labor Relations things, it could take even longer to get like final-final resolution? A. Correct."). Despite having a "concern" about Lewalski, Defendant Eckert did absolutely nothing that could have actually addressed it in real time. He never: (1) spoke to Lewalski about his uses of force; (2) counseled Lewalski about his uses of force; (3) asked someone else to speak with or counsel Lewalski; (4) ordered additional training for Lewalski; (5) evaluated Lewalski's fitness for duty; (6) did rounds to check on Lewalski; (7) reviewed Lewalski's past work history and

discipline; or (8) initiated any process that could lead to Lewalski's temporary reassignment, permanent reassignment, or discipline within the parameters of the CBA. *See* Exs. A at 13:2-16:25, 20:6-18, EE at 140:18-141:2, 141:24-142:10.

To the contrary, it was obvious to both Defendant Eckert and Lewalski himself that there would be no meaningful supervision of Lewalski's lawless conduct at the prison. When Lewalski was asked during his deposition whether Superintendent Eckert supervised his work at Wende, the following exchange occurred (Ex. P at 295:3-25):

> Q. I'm just going to ask you a few questions about Superintendent Eckert. Would you characterize Superintendent Eckert as an involved superintendent?
>
> A. Probably not, ma'am.
>
> Q. Is he more of a hands off manager?
>
> A. Yes, ma'am.
>
> Q. Did you feel that Superintendent Eckert took seriously the issues posed to the facility by K2 when it became prevalent?
>
> A. I don't have an opinion on that one way or the other, ma'am.
>
> Q. So when you say when you agree with the idea that he was more of a hands off manager, can you give me any examples of where he was more hands off?
>
> A. I would say that other superintendents maybe walked around the jail more, were seen them more, had more involvement with me maybe as a supervisor.
>
> Q. What involvement did he have with you as a supervisor, if any?
>
> A. Not a whole lot from what I recall.

Defendant Eckert's own account matches Lewalski's. Defendant Eckert testified that they had "talked a little bit" about things like "how his day was going, anything going on. It was just usual daily banter." Ex. A at 207:1-14. They never discussed Lewalski's "performance as a sergeant," "use of force," or anything of the sort. *Id.* at 207:15-19. In fact, the casual

16

conversations between Defendant Eckert and Lewalski may have ratified Lewalski's misconduct. It should come as no surprise that Lewalski formed an impression that his behavior was tolerated—if not condoned.

**ARGUMENT**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, summary judgment cannot be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

A court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Products., Inc.*, 530 U.S 133, 150 (2000). The Court "may not make credibility determinations or weigh the evidence." *Id.* Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**I. DEFENDANT ECKERT HE KNEW THAT LEWALSKI POSED AN EXCESSIVE RISK OF HARM TO IUNMATES BUT DID NOTHING TO ABATE IT**

Plaintiff alleges—and the evidence shows—that Defendant Eckert knew of the substantial risk of serious harm caused by Lewalski and failed to do anything to prevent or mitigate it. *See, e.g.*, Am. Compl. ¶¶ 292-293.

Defendant Eckert is liable under the Eighth Amendment for failure to prevent harm to Dante Taylor if Plaintiff can show "(a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (2d Cir. 1994)). Deliberate indifference in this context "means the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

For deliberate indifference claims against supervisors, the Second Circuit clarified in a 2020 decision, *Tangreti v. Bachmann*, that "[t]he focus is on what the supervisor did or caused to be done, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable." *Lopez v. Chappius*, No. 6:17-CV-06305, 2023 WL 2612507, at *7 (W.D.N.Y. Mar. 23, 2023) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). "It is undisputed that a constitutional violation must be directly attributable to a supervisory official in order to establish liability and cannot arise merely from their status as a supervisor." *Id.* Per *Tangreti*, the plaintiff "must bring forth evidence from which a reasonable jury could find that [the supervisor] *himself* had the requisite state of mind for a failure to protect claim: i.e. that he knew of and disregarded an excessive risk to [the plaintiff's] safety." *Cooper v. Sheahan*, No. 12-CV-1227S,

2022 WL 2974029, at *9 (W.D.N.Y. July 27, 2022) (emphasis in original) (citing *Tangreti*, 983 F.3d at 609).

### A. Defendant Eckert Knew that Lewalski Posed an Excessive Risk of Harm to Inmates

Defendant Eckert testified that he had a system for evaluating "red flag" behavior among staff to assess whether there was "an employee that may be headed down a bad road or that has become problematic and corrective action may be necessary." SUF ¶¶ 22-23, 31; Ex. A at 25:15-22. In the use of force context, Defendant Eckert would evaluate whether: the same officer was repeatedly involved in incidents; uses of force caused significant inmate injuries; there were inconsistencies in reporting; and injuries matched the staff accounts. Ex. A at 29:3-32:23, 42.

Under this rubric, Defendant Eckert repeatedly determined on his own that Lewalski's conduct in the prison was problematic and concerning. *See, e.g.*, *id.* at 71:1-72:3. And Defendant Eckert referred Lewalski to OSI five times over a sixteen-month period, which represented two-thirds of all of his referrals to OSI. *See id.* at 81:13-25. The reasons that Defendant Eckert referred Lewalski to OSI mirrored Lewalski's involvement in Dante Taylor's beating:

- Staff held back an inmate from transfer to the Special Housing Unit until Lewalski was on duty so that Lewalski could create a pretext to attack the inmate as retaliation for a prior infraction, Ex. D;

- Lewalski and others used force against an inmate on an escort to medical in response to the inmate purportedly taking an "aggressive stance," Ex. H;

- Lewalski struck an inmate repeatedly with his baton and, with others, used extreme force against an inmate complaining about his missing chess board that sent the inmate to the outside emergency room. Eckert identified inconsistencies in staff reports and serious injuries, Ex. I; and

- Lewalski and others assaulted an inmate in handcuffs who was facing the wall after the inmate's supposedly surprise backwards headbutt of an officer. Eckert referred it to OSI

19

"due to inmate being in restraints and [the inmate's lack of] disciplinary history," Ex. L.

In each of these cases, Eckert admitted, in written OSI referrals and his own testimony, that these incidents were concerning for the likelihood of Lewalski's inappropriate use of force. Applying the rubric Defendant Eckert himself established for what constitutes a "red flag," Lewalski's misconduct over sixteen months falls squarely within Defendant Eckert's framework. There was a pattern: Lewalski showed up again and again in use of force incidents and grievances, with serious injuries (such as grievous bodily harm that required emergency room treatment) and likely pretextual justifications for the use of force. Even beyond the cases that Defendant Eckert referred to OSI, approximately half of all Lewalski's uses of force during Eckert's tenure at Wende resulted in an inmate going to the emergency room. *See supra* at 5-9. Defendant Eckert knew all of this. This pattern was concerning in the lead up to another Lewalski use of force—against Dante Taylor—that had all the same hallmarks.

The extensive record of Defendant Eckert's personal involvement in the events at issue distinguishes this case from others post-*Tangreti* where courts have declined to find a supervisor liable for civil rights violations. Indeed, the facts of the cases that Defendant Eckert cites offer quintessential examples of how this case differs from the underdeveloped supervisory liability claims that *pro se* litigants often bring over ministerial issues without any meaningful supporting record. Defendant Eckert's cases are obviously inapposite. *See generally* ECF No. (323-1) ("Def.'s Br.") at 7-13 (Jan. 21, 2024).

For example, Defendant Eckert cites *Cooper*, where the Court declined to hold a prison supervisor liable for a *sui generis* prison riot. 2022 WL 2974029, at *8. Plainly, a prison riot is not the same as Defendant Eckert determining—over the course of months, after repeated and

20

varied red flags—that Lewalski posed an extreme risk of harm to inmates, but then deciding not to do anything about it.

Defendant Eckert also cites *Mitchell v. Chappius*, where the Court declined to hold a prison supervisor liable when "Plaintiff in his deposition could not recall why he named Superintendent Chappius as a Defendant . . . [and] Plaintiff did not file any grievances related to any particular actions taken by Superintendent Chappius." 750 F. Supp. 3d 123, 133, 141 (W.D.N.Y. 2024). Again, nowhere close to the same thing.

Defendant Eckert cites *Glover v. Doe*, where the court declined to find a supervisor liable because "[Plaintiff] simply does not allege that any of the Defendants was aware of a spider or bat infestation and ignored the serious risk of harm posed by the infestation." No. 22-CV-06104, 2022 WL 2718508, at *4 (W.D.N.Y. July 13, 2022). That case too is inapposite.

The only case that Defendant Eckert cites that is factually analogous to the case at bar is *Ramsay-Nobles v. Keyser*, a pre-*Tangreti* case where the court denied the Superintendent defendant's motion for summary judgement. *See* No. 16-CV-5778, 2019 WL 4383187, at *15-17 (S.D.N.Y. Aug. 21, 2019). In that case, the record demonstrated that the superintendent defendant had multiple red flags that a corrections officer defendant—with the highest uses of force at the prison—posed a serious risk of harm to inmates at the Sullivan Correctional Facility. Subject to the jury's factual determination, the court found that the superintendent could be held liable for the fatal beating of an inmate by that same corrections officer even though the supervisor was not involved in the beating. *Id.* at *15, *34-37. There, like here, multiple red flags suggested the officer's propensity to use excessive or improper force, which were independently determined by the superintendent. *Id.* at *15. *Ramsay-Nobles* does not support Defendant Eckert's motion, and, if re-heard today, it would assuredly satisfy the *Tangreti* standard, because

21

the superintendent was personally involved in identifying and then deciding not to remediate an extreme risk that jeopardized the safety of incarcerated people under his supervision.

In *Tangreti*, the Second Circuit did not foreclose supervisors from liability under 1983. *See Tangreti*, 983 F.3d at 616. If there were ever a case that met the *Tangreti* standard, it is this one. The only way that the record before the Court could be more extreme is if Defendant Eckert admitted liability. *See Edwards v. Quiros*, 986 F.3d 187, 194 (2d Cir. 2021) (evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk); *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (the mental state of deliberate indifference means that the defendant acted or failed to act while actually aware of a substantial risk that serious inmate harm would result).

While this record alone, irrespective of Defendant Eckert's self-serving protestations to the contrary, can be enough for a reasonable jury to find that Defendant Eckert knew that Lewalski was operating outside the lines of the appropriate use of force against inmates, this is fundamentally an issue for the jury to decide.

**B.      Defendant Eckert Disregarded the Risk of Harm that Lewalski Posed**

Defendant Eckert admits that Lewalski's track record was "concerning," and that he did nothing to address it other than refer Lewalski to OSI, as part of a process that can take months or years to resolve. Ex. A at 199:11-22. While Defendant Eckert claims in his brief that "the only steps that were available to him" were to refer Lewalski to OSI, *see* Def.'s Br. at 12-13, that is simply not true. At best, this is a dispute of fact. Defendant Eckert could have undertaken any of the following interventions without implicating the procedural requirements in DOCCS policy or the CBA (*see* EE at 140:18-141:2, 141:24-142:10), but never did (Ex. A at 13:2-16:25, 20:6-18): (1) spoke to Lewalski about his uses of force; (2) counseled Lewalski about his uses of force; (3)

asked someone else to speak with or counsel Lewalski; (4) ordered additional training for Lewalski; (5) evaluated Lewalski's fitness for duty; (6) did rounds to check on Lewalski; (7) reviewed Lewalski's past work history and discipline; or (8) initiated any process that could lead to Lewalski's temporary reassignment, permanent reassignment, or discipline within the parameters of the CBA.

Defendant Eckert never did any of them. *See* Ex. A at 40:5-47:17, 70:12-25, 82:16-83:22, 95:13-25. They all could have influenced a subordinate's behavior in a prison. *See* Ex. B at 239:5-240:9. To the contrary, when Defendant Eckert testified that the extent of his interaction with Lewalski was that they had "talked a little bit," *i.e.*, "how his day was going, anything going on. It was just usual daily banter," Ex. A at 207:1-14—and that they never discussed Lewalski's "performance as a sergeant," "use of force," or anything of the sort, *id.* at 207:13-19—a jury could conclude that Defendant Eckert implicitly ratified Lewalski's misconduct. When all the Superintendent has to say is "how was your day" after he has repeatedly referred your uses of force to OSI and reviewed a half-dozen others with grievous injuries to inmates over a 16-month period, it is no surprise that Lewalski had the impression that he could go on unchecked.

Defendant Eckert disregarded the excessive risk of harm to Dante Taylor and the other Wende inmates posed by Lewalski.

## II.     DEFENDANT ECKERT IS NOT ENTITLED TO QUALIFIED IMMUNITY

Defendant Eckert claims to be insulated from liability based on qualified immunity. *See* Def.'s Br. at 13-16. That is incorrect. "[I]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment" on qualified immunity grounds. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995); *see, e.g.*, *Nicholas v. Tucker*, 89 F. Supp. 2d 475, 481 (S.D.N.Y. 2000) ("Where there are disputed issues of fact relevant to the qualified immunity defense, summary judgment is not

appropriate."); *Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995) ("The defendant bears the burden of pleading and proving the affirmative defense of qualified immunity.").

"The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established', whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gibson v. Cuomo*, No. 20-CV-1455, 2023 WL 3793989 (W.D.N.Y. Mar. 28, 2023) (citing *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)). Defendant Eckert does not appear to dispute the first element. *See* Def.'s Br. at 13-16. Of course, Dante Taylor had a clearly established right to be protected from a substantial risk of harm. *See Farmer*, 511 U.S. at 834; *Percinthe v. Julien*, No. 08-CV-893, 2009 WL 2223070, at *18 (S.D.N.Y. July 24, 2009) ("It is clearly established law that the Eighth Amendment not only prohibits excessive force, but also requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody.") (cleaned up).

For the second element, Defendant Eckert claims that the "level of personal involvement sufficient to maintain a Section 1983 claim based [against a supervisor] was not clearly established" in 2017 when these events occurred because the Second Circuit raised the standard for supervisor liability under Section 1983 in its 2020 decision in *Tangreti*. Def.'s Br. at 14-15. But Defendant Eckert's misconduct would have violated the pre-*Tangreti* standard articulated in as well as the post-*Tangreti* standard. *Compare Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (five ways a plaintiff could show personal involvement of a supervisor), *with Tangreti*, 983 F.3d at 618 (each official must be liable through that individual's own individual actions).

At all times since the Second Circuit articulated the pre-*Tangreti* standard for supervisor liability, it has been a violation of the Eighth Amendment for any prison official—supervisor or

otherwise—to determine on his own that an officer poses an excessive risk of harm to inmates and then, aware of that risk, and with the power to intervene, fail to do anything about it. *Tangreti* makes it clear that supervisors can still be held liable for prison violations, just under factual scenarios that resemble the case before this Court.

For the third element, Defendant Eckert claims that "Eckert could not have understood that his conduct violated Plaintiff's constitutional rights." *See* Def.'s Br. at 15. But a reasonable jury could find that Defendant Eckert's actions and inactions in response to warnings about Lewalski were "objectively unreasonable," making summary judgment inappropriate on grounds of qualified immunity. *See, e.g.*, *Stephens v. Venetozzi*, No. 13-CV-5779, 2016 U.S. Dist. LEXIS 24123, at *77-78 (S.D.N.Y. Feb. 24, 2016) (denying qualified immunity defense where the plaintiff alleged that the defendant superintendent denied the plaintiff's request for a transfer "without conducting any investigation or taking any protective action, on the basis that Plaintiff had not identified by name the . . . staff members who were the source of his fear"); *Morgan v. Dzurenda*, No. 3:14-CV-966, 2017 U.S. Dist. LEXIS 48445, at *24 (D. Conn. Mar. 31, 2017) (denying qualified immunity defense where the plaintiff "reported his fears" about another inmate, the "Defendants ignored the reports," and the inmate assaulted the plaintiff); *Livingston v. Rivera*, No. 94-CV-5319, 1999 WL 26902, at *4 (E.D.N.Y. Jan. 20, 1999) (denying qualified immunity due to factual dispute on "the nature and extent of [the defendant's] actual knowledge of any risk of substantial harm to [the plaintiff] in his new housing unit").

Eckert is not entitled to qualified immunity, particularly in light of the myriad disputed facts central to resolution of this dispute.

## CONCLUSION

For the reasons set forth above, this Court should deny Defendant Eckert's motion for summary judgment so that a jury can decide the disputed facts.

Dated: May 23, 2025
New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

/s/
Katherine Rosenfeld
Daniel M. Eisenberg
Eric Abrams
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*Counsel for Plaintiff Darlene McDay*