UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DARLENE McDAY, individually and as
Executrix of the Estate of DANTE TAYLOR,
*et al.*,

               Plaintiffs,

v.

STEWART ECKERT, Superintendent,
Wende Correctional Facility, *et al.*,

               Defendants.

**REPORT, RECOMMENDATION
AND ORDER**

1:20-cv-233-JLS-JJM

This action arises from the October 7, 2017 suicide of Dante Taylor, an inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS") at the Wende Correctional Facility, and a use of force incident with correction officers the day before his death. *See* Amended Complaint [57].[1]

Before the court are defendants' motions for summary judgment [323, 325, 328, 329, 330, 332, 333] pursuant to Fed. R. Civ. P. ("Rule") 56, as well as plaintiff Darlene McDay[2] and defendants' motions to exclude expert testimony [324, 326, 327, 331, 334, 335, 336, 338]. The motions have been referred to me by District Judge John L. Sinatra, Jr. for initial consideration [23].

Having considered the parties' submissions, I recommend that the motions for summary judgment be denied. McDay's motion [331] to exclude the testimony and opinion of

---

[1]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

[2]     While Temple McDay is still listed as a plaintiff, her claim for loss of intimate association was dismissed. Decision and Order [101] at 4.

proposed expert John Rourke is granted, and the parties' remaining motions to exclude [324, 326, 327, 334, 338, 335, 336] are denied, subject to the limitations described herein.

## BACKGROUND

At all relevant times, Dante Taylor was in DOCCS' custody at Wende Correctional Facility, serving a life sentence without the possibility of parole. Eckert Statement of Undisputed Fact ("SOUF") [323-15], ¶3; Lewalski SOUF [333-1], ¶2. Taylor had a medical history of anxiety, depression, suicidal ideation, alcohol and substance abuse, and "anger issues". Medical Opinion of Christopher Rosenbaum, M.D., M.S.C.I. [333-10] at 3; Autopsy Report [350-2] at 9.

On or around June 22, 2017, Taylor was hospitalized for abuse of a synthetic cannabinoid known as K2. [333-10] at 3. On October 5, 2017, Taylor again ingested K2, had a negative reaction, and was treated at the facility infirmary. [333-10] at 3. In responding to this incident, a nonparty correction officer ("CO") was injured slipping on some water that Taylor had thrown on the floor. Eckert SOUF [357-38], ¶¶37, 39. Taylor was discharged the following day and returned to his cell. [333-10] at 3.

On October 6, 2017, COs White, Horbett, and Janis received a call over the radio regarding an emergency in A Block. White SOUF [328-2], ¶13; Horbett SOUF [329-1], ¶13; Janis SOUF [332-3], ¶13. White, Horbett, and Janis proceeded to A Block and, ultimately, to Taylor's cell. [328-2], ¶¶13-14; [329-1], ¶15; [332-3], ¶14. There, according to the officer defendants, they observed Taylor on the floor yelling, screaming, flailing and thrashing his head and body violently on the floor. [328-2], ¶14; [329-1], ¶15; [332-3], ¶14; [333-1], ¶¶39-40. Taylor was reportedly lying face down with his head to the back of the cell. [328-2], ¶14; [329-

1], ¶15. Horbett attempted to speak to Taylor from outside the cell, but Taylor continued yelling and screaming. [328-2], ¶15; [329-1], ¶16; [332-3], ¶15.

Sergeant Lewalski, who also responded to the call, then arrived and encountered COs White, Horbett, and Janis outside Taylor's cell. [333-1], ¶37. Lewalski debriefed the officers, assessed the situation, and concluded that Taylor had likely ingested drugs. [333-1], ¶¶39-43. Lewalski then instructed White, Horbett, and Janis to go into Taylor's cell and restrain him. [328-2], ¶¶16-17; [329-1], ¶¶17-18; [332-3], ¶16-17; [333-1], ¶44.

COs White, Janis, and Horbett entered Taylor's cell. [328-2], ¶18; [329-1], ¶18; [332-3], ¶18. White took control of Taylor's right arm. [328-2], ¶18. Janis took control of his left arm. [332-3], ¶18. Horbett grabbed his ankles. [329-1], ¶19. Sergeant Lewalski then placed restraints on Taylor's wrists and ankles. [329-1], ¶19. The officers picked up and carried Taylor from his cell. [328-2], ¶20; [329-1], ¶20; [332-3], ¶19. Taylor was taken down the stairs to the "flats" area on the first floor of A Block and placed on a gurney. [328-2], ¶20; [329-1], ¶20; [332-3], ¶19. He was then taken to the infirmary by other officers. [333-1], ¶49.

As to COs McDonald and Maldonado, there is conflicting testimony as to whether they were present during the confrontation with Taylor, and whether Maldonado was physically involved. *See* [350-36], ¶¶25, 30; [350-37], ¶13. It is uncontested that those COs did not enter Taylor's cell during the incident. *See* [350-36], ¶¶82-87; [350-37], ¶13.

After the incident, Sergeant Lewalski ordered a search of Taylor's cell. [333-1], ¶50. A nonparty officer discovered two rolled cigarettes, one which was half burned. [333-1], ¶51. The cigarettes tested positive for synthetic cannabis. [333-1], ¶51.

Inmate witnesses tell a different version of the October 6th encounter. Inmates Terrence Beckley and Alfred DeGraw were housed in cells near Taylor. [333-1], ¶¶67, 78.

Beckley testified that, on October 6, 2017, he had been checking in on Taylor due to his negative drug reaction the previous day. [333-1], ¶¶68, 71. At about 9:30 p.m., Taylor stopped responding. [333-1], ¶71. Beckley observed Taylor through a mirror and found him lying on his bed "twitching" and unresponsive. Beckley Deposition [350-11] at 5-6. He concluded that Taylor was having a drug-induced "episode . . . kind of like a seizure". Id. 7-8.

Beckley and other inmates began yelling for corrections officers to assist. Id. at 8. Several officers responded and told Taylor to get down on the floor. Id. at 9-12. However, Taylor was unresponsive, and he remained sitting on his bed staring at the wall. Id. at 12. Officers then entered Taylor's cell and pulled him to the floor and attempted to restrain him. Id. at 13. At which point, the officers "kind of start to attack him", "jabbing" Taylor in the upper shoulder area with their batons, and otherwise striking him with their batons and fists in his face and body. Id. at 14, 20-23. Beckley believed they were hurting him, and yelled at the officers to stop. Id. at 17-8. Taylor began vocalizing then stopped. Id. at 15. After that, the officers put Taylor in handcuffs and carried him out of the cell. Id. While he was being carried, Taylor was not moving or making any sound. Id.

DeGraw testified that he was aware that Taylor had been hospitalized for K2 usage. [357-25] at 28. On the day of incident, Beckley told him that Taylor was having a seizure, and they both called for help. Id. at 44. Two COs responded and tried to get Taylor's attention. Id. at 46. When he didn't respond, the COs joked that he was "in la la land". Id. Then more COs arrived, including Sergeant Lewalski. Id. at 47. After the officers entered the cell, DeGraw heard what he believed to be the sound of Taylor being hit. Id. at 55. He heard Taylor screaming, and someone yelling "stop f---cking hitting him". Id. He then saw Taylor being carried out down the company, unresponsive. Id. at 55-56.

David Hayes was also an inmate at Wende, seven cells down from Taylor. [350-35], ¶92. While Hayes could not see into Taylor's cell, he testified that he observed COs in the hallway waiting for Sergeant Lewalksi, who appeared with zip ties and then ran into the cell. [350-16] at 6. He also testified that he saw CO Maldonado kicking Taylor in the face from the hallway, when Taylor was "halfway out" of the cell. Id. at 5.

McDay also adduces an affidavit from Wesley Molina Cirino, who avers that he was in the cell next to Taylor and was witness to the events. [357-34] at 5 (as translated). Cirino averred that officers entered Taylor's cell and "beat him up", though he does not say whether he personally observed this. Id. He heard "yelling and banging". Id. He asked CO Rivera "why are you beating him up?" Id. Taylor was yelling "why are you hitting me", and the COs told him to shut up. Id. Afterwards, Taylor went silent, and the COs carried him out of the cell. Id. Taylor had bruises on his face and his nose was bleeding. Id. Cirino watched through a mirror as they carried Taylor to the steps and threw him down the stairs. Id. The following day, COs Rivera, Maldonado, and Lewalski threatened him to keep quiet about the incident. Id.

A post-incident medical report from ECMC describes Taylor as having "extensive facial injuries" among other injuries. ECMC ED Provider Report [350-19] at 2. Post-incident photographs of Taylor's face depict such injuries. Photographs [350-20], [350-21].

At 10:20 a.m. on October 7, 2017, Taylor was found unresponsive in his cell with a bedsheet tied around his neck. [328-2], ¶22 (citing Amended Complaint [57], ¶¶34, 35, 240, 243-248); [332-3], ¶21 (same); [350-2] at 9.  He was taken to the hospital and pronounced dead at 11:51 a.m. Id.  In an autopsy report, Erie County Medical Examiner Dr. Tara Mahar found Taylor's injuries consistent with hanging and ruled his death a suicide. [350-2] at 10. She also noted "numerous recent blunt injuries of the head, torso, and extremities" which were

"concerned for inflicted injuries (i.e., not self-inflicted)", though "a portion of [such injuries] were consistent with the restraint techniques reportedly used". Id.

In an investigative report, the DOCCS Office of Special Investigations ("OSI") agreed that Taylor's death was a suicide, but it also "substantiated" the allegation that COs assaulted Taylor on October 6, 2017, and that COs made materially false statements regarding their use of force on that day. [323-8] at 1.

Around the time of the incident, there had been "a rash of K2 incidents" at the prison. Lambert Deposition [333-25] at 13-14; see DeGraw Deposition [333-27] at 25 (calling K2 usage at Wende "an epidemic"). Prison staff had been advised that, based on supervisor discretion, they could use leg restraints on affected inmates to prevent injury. DOCCS Memorandum dated April 21, 2017 [333-12] at 2; [333-25] at 13-14.

## DISCUSSION

McDay's remaining claim is brought pursuant to 42 U.S.C. §1983 and asserts violations of the Eighth Amendment by all remaining defendants - specifically, that defendants employed excessive force against Taylor on October 6, 2017, and/or that defendants failed to intervene and/or protect Taylor from such excessive force. See Amended Complaint [57], ¶¶291-98; Decision and Order [101]; Text Order [304]; Stipulation [310].

### A.    Motions for Summary Judgment

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003). "In moving for summary judgment against a

party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996) (*citing* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). Once done, "[t]he burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial". <u>Golisano v. Turek</u>, 168 F. Supp. 3d 527, 530 (W.D.N.Y. 2015). "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant." <u>Ford</u>, 316 F.3d at 354. "Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." <u>Id.</u>

Defendants White, Horbett, Janis, Maldonado, and Lewalski argue that the record does not establish the use of excessive force. [328, 329, 330, 332, 333]. Defendants McDonald, Maldonado, and Lewalski argue that the record does not establish failure to intervene. [325, 330, 333]. Defendants Eckert, McDonald, and Maldonado argue that the record does not establish they were personally involved in any constitutional violations. [323, 325, 330].

### 1.     Excessive Force (White, Horbett, Maldonado, Janis, Lewalski)

The Eighth Amendment prohibits "the infliction of cruel and unusual punishments, including the unnecessary and wanton infliction of pain". <u>Sims v. Artuz</u>, 230 F.3d 14, 20 (2d Cir. 2000). In a claim for excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992). An excessive force claim has an objective and subjective component. <u>Mustafa v. Pelletier</u>, 2023 WL 7537625, *1 (2d Cir. 2023). The objective component requires "the nature of the force" to be "nontrivial". <u>Wilkins v. Gaddy</u>,

559 U.S. 34, 39 (2010). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability shown by actions characterized by 'wantonness'" considering the circumstances surrounding the challenged conduct. Wright v. Goord, 554 F. 3d 255, 268 (2d Cir. 2009).

### Excessiveness of Force

Defendants argue that on the evening of October 6, 2017, Taylor was "out of control" and "thrashing and flailing", that he was unresponsive to verbal commands, and that officers used appropriate force to protect him and themselves from further injury. [328-18] at 4; [329-3] at 6-7. That version of events is contested.

McDay offers testimonial evidence from inmate witnesses, medical evidence from before and after Taylor's death, and an investigative report from DOCCS OSI. [350]. The inmate witnesses contradict defendants' contention that Taylor was "out of control", with Beckley describing him as merely "twitching" and unresponsive. Beckley Deposition [350-11] at 5-6. When responding officers called for him, Taylor "just sat there" on his bed "star[ing] at the wall". Id. at 12. DeGraw testified that the two responding officers joked that Taylor was "in la la land". DeGraw Deposition [350-14] at 5.

Upon entering the cell, the officers (according to Beckley) pulled Taylor to the floor and "attack[ed] him" with batons and punches. [350-11] at 14, 20-23. The other two inmates recalled hearing sounds of a person being hit. DeGraw [357-25] at 55; Cirino [350-15] at 5. Beckley protested, telling the officers to stop. [350-11] at 17-18; see DeGraw [357-25] at 55 (hearing people telling the COs to stop). The inmate witnesses recall Taylor yelling, then going silent. Beckley [350-11] at 15; DeGraw [357-25] at 55-56; Cirino [350-15] at 5. The COs then

carried Taylor out of his cell, at which point he was silent and unresponsive. Id. Cirino averred

that the COs then "threw him down the steps". [350-15] at 5.

      This testimonial evidence, by itself, is sufficient to deny summary judgment as to

the excessive force claim. See, e.g., Clarke v. Anderson, 2012 WL 3292879, *5 (W.D.N.Y.

2012) ("[c]rediting plaintiff's version of events, . . . [defendants'] use of force was unrelated to

any effort to maintain order or discipline").

      McDay also offers post-incident medical records and photographs, which describe

and depict Taylor as having "extensive facial injuries" among other injuries. ECMC ED Provider

Report [350-19] at 2; see Photographs [350-20], [350-21]. She produces the autopsy report

authored by Chief Medical Examiner Dr. Tara Mahar, in which Dr. Mahar noted various "blunt

force injuries" to Taylor's head, neck, torso and extremities that she opined were "concerning for

inflicted injuries (i.e., not self-inflicted)". [350-2] at 10. Dr. Mahar's suspicion is shared by

plaintiff's medical expert, Dr. Zhongxue Hua, who opined that the "patterned injuries as well as

the distribution of Mr. Taylor's bruises . . . are most consistent with inflicted as compared to self-

inflicted injuries". Hua Report [350-23], ¶35. This evidence is plainly at odds with defendants'

version of events, in which Taylor's injuries were entirely self-inflicted. See Benson v. Yaeger,

2009 WL 1584324, *4 (W.D.N.Y. 2009) ("the existence of medical evidence that contradicts the

defendants' version of events can preclude summary judgment by raising an issue of fact").

      Finally, McDay offers an internal investigation report from DOCCS OSI, which

broadly substantiated the allegations that "on the evening of October 6, 2017, Taylor was

assaulted inside his cell by numerous officers after responding to a medical emergency" and that

the officers' statements regarding the use of force contained material falsehoods. [350-12] at 2.

Such findings are generally admissible under Fed. R. Evid. 803(8)(A)(iii) as "factual findings

from a legally authorized investigation" and can support a denial of summary judgment where they support the non-movant's claim. *See* Cortes v. MTA New York City Transit, 802 F.3d 226, 232 (2d Cir. 2015); Hill v. City of New York, 2005 WL 3591719, *4 (E.D.N.Y. 2005) (denying summary judgment on excessive force claim where the evidence included a report substantiating plaintiff's claim).

### Involvement of Individual Officers

To the extent some officer defendants argue that there is no evidence specifying which of the COs applied excessive force (*see* White MOL [328-18], Lewalski [333-29] at 17-18), that is belied by Beckley's testimony that all four officers were inside the cell delivering blows to Taylor. [350-11] at 14, 22-23 ("the four that were in the cell . . . , they were all punching him"). In addition, inmate witness Hayes testified to seeing CO Maldonado kicking Taylor in the face while Taylor was "halfway out" of the cell. [350-16] at 5. The evidence is plainly sufficient to present an issue of fact as to whether defendants White, Horbett, Maldonado, Janis, and Lewalski applied excessive force to Taylor on October 6, 2017.

In any event, an officer "is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." Paul v. City of New York, 2017 WL 4271648, *4 (S.D.N.Y. 2017) (citations omitted). At the summary judgment stage, "[a] plaintiff need not establish which officer, among a group of officers, directly participated in the attack and which officer failed to intervene". Jeffreys v. Rossi, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), aff'd, 426 F.3d 549 (2d Cir. 2005); *see also* Hepburn v. City of New York, 2025 WL 1640205, *13 (E.D.N.Y. 2025); Piper v. City of Elmira, 12 F. Supp. 3d 577, 596 (W.D.N.Y. 2014) (citation omitted).

### 2.    Failure to Intervene (McDonald, other officer defendants)

"Absent direct participation in an act of excessive force, defendants may still be held liable for constitutional violations under a failure to intervene theory." Seweid v. County of Nassau, 2024 WL 693981, *18 (E.D.N.Y. 2024). As discussed above, "a plaintiff need not establish which officer, among a group of officers, directly participated in the attack and which officer failed to intervene." Paul, 2017 WL 4271648 at *4 (citations omitted). Of course, "the mere fact that an officer was present for the entire incident does not, on its own, establish that he had either awareness of excessive force being used or an opportunity to prevent it". Piper, 12 F. Supp. 3d at 596 (citation omitted).

As above, there is evidence that defendants White, Horbett, Maldonado, Janis, and Lewalski participated directly in an attack on Taylor on October 6, 2017. That leaves only CO Kelly McDonald, who, the parties seem to agree, was present at the scene but did not actively participate in the attack. However, McDay offers evidence that not only did she fail to intervene in the attack, but that she actively participated in concealing it - telling inmate Beckley to "[t]ake [his] fucking mirror off the gate" and, after he refused, proceeding to "snatch[] [the mirror] from [him] and toss[] it on the floor". [350-11] at 15-16.

This is sufficient to allow the claim to proceed as to the officer defendants.[3] Accordingly, I recommend that the officer defendants' motions for summary judgment be denied.

---

[3]    Defendant McDonald's motion argues that the Amended Complaint does not assert a claim against her for failure to intervene. See MOL [325-2] at 2-3. However, it does. See Amended Complaint [57], ¶292 ("the Officer Defendants used malicious and sadistic, gratuitous, excessive, brutal, objectively unreasonable, and unconscionable force on Mr. Taylor, and/or failed to prevent other officers from doing so despite having a reasonable opportunity to intervene").

### 3.     Supervisory Liability (Eckert)

McDay contends that former Superintendent Eckert, who was responsible for overseeing the corrections staff at Wende, was deliberately indifferent to the risk of harm to inmates presented by Lewalski, who McDay asserts had a concerning history of use-of-force incidents. [357] at 22-27. This claim differs conceptually from the excessive force claims asserted against the officer defendants.[4] Eckert argues that: (a) McDay's claim does not meet the standard for supervisor liability under Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020); (b) Lewalksi did not present an unreasonable risk of serious harm; (c) Eckert was not deliberately indifferent to any such harm; and (d) Eckert is entitled to qualified immunity. [323-1] at 7-16.

In a section 1983 claim, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution'". Tangreti, 983 F.3d at 618 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Accordingly, "[a] supervisor cannot be held vicariously liable for the actions of his subordinates under a respondeat superior theory". Stephens v. Venettozzi, 2016 WL 929268, *12 (S.D.N.Y. 2016) (citing Iqbal, 556 U.S. at 676). Nor is a claim for negligent supervision or retention cognizable. See Tangreti, 983 F.3d at 620 ("it is not enough for Tangreti to show that Bachmann was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had");

---

[4]     Eckert questions whether the Amended Complaint adequately articulates a claim against him. See MOL [323-1] at 8-9. The Amended Complaint seemed to contemplate that there had been a culture of "harassment and staff antipathy towards Mr. Taylor" that Eckert failed to remedy. [57], ¶293. McDay seems to abandon that contention and now focuses on the claim that Eckert was aware of, and failed to mitigate, the risk that CO Lewalski posed to the inmate population in general. [357] at 27. As McDay alleges that Eckert "was deliberately indifferent to the rights and safety of Mr. Taylor and other individuals confined at Wende" ([57], ¶292), and there appears to be no issue of notice, I am satisfied that this claim has a textual basis in the Amended Complaint.

<u>D.J. by Comfort v. Corning-Painted Post Area School District</u>, 722 F. Supp. 3d 148, 166 (W.D.N.Y. 2024).

Rather, "[t]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must [show] both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference'" towards that harm. <u>Vega v. Semple</u>, 963 F.3d 259, 273 (2d Cir. 2020) (*quoting* <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)). "A plaintiff may state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at the facility." <u>Ramsay-Nobles v. Keyser</u>, 2019 WL 4383187, *15 (S.D.N.Y. 2019) (citation omitted). Eckert argues that McDay fails to establish either the objective or subjective prong. [323-1] at 10-15.

### Unreasonable Risk of Serious Harm

"Generally, a claim based on a generalized risk of assault requires facts showing a 'longstanding, pervasive, well-documented' history of similar attacks, coupled with 'circumstances suggesting that the defendant-official being sued had been exposed to this information." <u>Stephens</u>, 2016 WL 929268 at *21 (citations omitted). As to the objective prong, "unreasonable risk of serious harm", McDay cites to 10 unusual incident reports preceding Taylor's death:

- On May 23, 2016, an inmate struck a CO in the chest. Lewalksi applied restraints. No injuries were reported. [357-4] at 2, 3, 14.

- On June 9, 2016, Lewalski escorted an inmate to SHU, who reportedly began resisting, prompting Lewalski to strike the inmate several times with baton. The inmate suffered bruising and lacerations. The incident was referred to OSI on the basis that "circumstances and injuries appear[ed] suspect to staff account of the incident". [357-5] at 2, 7, 17.

-13-

- On July 13, 2016, an inmate reportedly attacked Lewalski and another officer. Lewalski struck the inmate in the thigh with his baton "breaking the baton in half". The inmate suffered scratches and bruising. [357-6] at 2, 19.

- On November 20, 2016, Lewalski was pat-frisking an inmate when the inmate reportedly turned and struck another CO in the face. The inmate suffered minor scratching, swelling, and dislocated elbow, though there was no reported use of force by Lewalski. [357-7] at 2-4.

- On January 13, 2017, an inmate reportedly struck another officer during a pat-frisk. The inmate suffered a small abrasion and cut. Lewalski was present but was not reported to have used force. [357-8] at 2-4.

- On January 29, 2017, a fight among inmates reportedly lead to one inmate striking a CO. Lewalski was reportedly present but not involved. Incident was referred to OSI due to the "circumstances involved". [357-9] at 2; 9-11.

- On February 9, 2017, an inmate was reportedly causing a disturbance. Lewalski ordered the inmate to sit down and ordered another CO to take him to his cell. The inmate then shoved the CO and Lewalski, prompting Lewalski to use a "body hold". The inmate suffered bruising, superficial cuts, swelling. [357-10] at 2-4.

- On April 30, 2017, an inmate was pat-frisked for suspected contraband and reportedly shoved a CO, a struggle ensued, and Lewalski responded to scene. No reported use of force by Lewalski. [357-11] at 2-3, 5

- On May 1, 2017, Lewalski was responding to an inmate fight, when one of the inmates struck him. Another CO grabbed the inmate, and Lewalski struck the inmate with his baton several times on the back and shoulder, as did another CO. The inmate suffered lacerations on head and elsewhere, abrasions, and swelling. The incident was referred to OSI "due to inconsistency in staff reports, inmate interview and inmate injuries". [357-12] at 2-3, 5, 9.

- On October 6, 2017, an inmate being pat-frisked head-butted a CO. Two COs wrestled the inmate to the ground. No injuries or use force by Lewalski was reported. Referred to OSI "due to inmate being in restraints and his disciplinary history". [357-13] at 2, 3, 5.

    These reports span a year and a half, and reflect that Lewalksi personally used some degree of force against inmates on five occasions during that time. Three of those occasions involved Lewalski employing baton strikes, including one incident in which Lewalksi "br[oke] the baton in half" striking an inmate. [357-6] at 2-3. Moreover, the fact that Lewalski

did not personally employ force during some use-of-force incidents does not necessarily render them irrelevant to the risk of harm analysis, as Lewalski was in a supervisory role, and there was inmate testimony suggesting that other COs felt emboldened to use force under his supervision.

Eckert testified that he would refer incidents to OSI for investigation if he had a "question" about whether a particular use of force "complies with directive". Eckert Deposition [357-2] at 16, 40, 83. Eckert referred five use-of-force incidents involving Lewalski to OSI for investigation, though that total includes two incidents from October 6, 2017 – including the alleged attack on Taylor. Id. at 78-83; 178-81. Eckert testified that he would typically refer only four or five incidents per year in total. Id. at 82. To his knowledge, none of the referred incidents (other than the incident with Taylor) were substantiated by OSI. Id. at 199.

Lewalski was also the subject of at least two "code 49" inmate grievances (*i.e.*, those alleging staff misconduct or harassment) prior to October 7, 2017. *See* [357-38] ¶¶25, 93. Both of those incidents were reviewed by Eckert or his designee. Id., ¶94. Neither were referred to OSI. Id., ¶95. Eckert was not aware of Lewalski having been disciplined for excessive or improper force. Id., ¶106.

Plaintiff also cites to a DOCCS report listing over 100 "unusual incidents" involving Lewalski between the years of 2014-2018. [323-13], [357-28]. As defendant correctly points out, many of these incidents will be irrelevant as: (1) not every unusual incident involves a use of force; (2) the majority of the incidents described do not suggest any use of force; (3) the logs are very cursory and do not identify who, if anyone, used force; and (4) 19 of the incidents occurred after October 6, 2017. *See* id. Still, at least 10 of the incident descriptions specifically reference use of force, and several others suggest that force was likely involved. Id.

Finally, plaintiff offers expert opinion that "Lewalski posed an outsized and substantial risk of using excessive force against inmates at Wende", as evidenced by his "disproportionate number of referrals" to OSI and other "red flags" such as accusations of false reporting. Expert Report of Patrick Hurley [357-30] at 5-8.

While that remains to be decided by the trier of fact, I find that the proffered evidence, considered as a whole, is sufficient to raise a question of fact as to whether Lewalski presented an "unreasonable risk of serious harm" to Wende inmates. *See, e.g.*, Ramsay-Nobles, 2019 WL 4383187 at *15 ("Plaintiff raises a triable issue of fact that, viewed objectively, [the inmate's] incarceration in a unit overseen by an officer with a long record of using force, and long list of grievances describing unprovoked attacks, posed a substantial risk of serious harm").

### Deliberate Indifference

"Deliberate indifference under the Eighth Amendment standard means the official must 'know of and disregard an excessive risk to inmate health or safety'." Vega, 963 F.3d at 273. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a [government] actor disregarded a known or obvious consequence of his action." Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 410 (1997). "Deliberate indifference is a mental state equivalent to subjective recklessness. . . . The charged official must be subjectively aware that his conduct creates such a risk." Salahuddin v. Goord, 467 F.3d 263, 281 (2d Cir. 2006); *see* Farmer, 511 U.S. at 835 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Eckert became superintendent of Wende in March 2016. Eckert Deposition [357-2] at 10. Eckert averred that he was not advised about any issues with Lewalski, or anyone else,

upon assuming the job. [323-4], ¶¶60-61. He was unaware of Lewalski having been previously disciplined for excessive or improper force. Id., ¶99.

Nevertheless, Eckert does not dispute that he had knowledge of most, if not all, of the incidents referenced above. Eckert himself would review and sign unusual incident and use-of-force reports. [357-2] at 45-46. He also testified that not all uses of force resulted in an unusual incident report. Id. at 33. He was sufficiently concerned about at least three use-of-force incidents in the span of less than a year to refer them to OSI for investigation. Id. at 16, 40, 78-83, 178-81. That was noteworthy, as he would typically refer only four or five incidents per year. Id. at 82. These actions are sufficient to demonstrate that Eckert had subjective knowledge that Lewalski presented a risk (potentially an unreasonable one) of serious harm to inmates. Cf. Mitchell v. Chappius, 750 F. Supp. 3d 123, 150 (W.D.N.Y. 2024) ("Plaintiff does not provide evidence that points to Superintendent Eckert being aware of facts from which an inference could be drawn that a substantial risk of serious harm existed").

Upon a showing that defendant "had the requisite 'culpable intent', plaintiff must further show that defendant "disregard[ed] that risk by failing to take reasonable measures to abate the harm". Smith v. New York State, 2024 WL 4746554, *2 (2d Cir. 2024) (Summary Order) (quoting Hayes v. N.Y.C. Department of Corrections, 84 F.3d 614, 620 (2d Cir. 1996)).

Here, Eckert clearly took some measures to abate the risk in that he referred incidents to OSI. None of the referred incidents were (apparently) substantiated by OSI. Id. at 199. However, Eckert did not take any other action with respect to the referred incidents. Id. at 96. Eckert argues that he had limited authority to discipline or reassign COs, and referring the incidents to OSI sufficiently discharged his responsibility.

In opposition, McDay offers expert opinion that Eckert could have reduced the risk of violence by, among other things, speaking to Lewalski, counseling him on his use of force, ordering him to attend additional training, making rounds, seeking his reassignment, or by further investigating Lewalski's work history and discipline – all of which he declined to do. Hurley Report [357-30] at 10-11. With this evidence to consider, a jury might be persuaded that Eckert's referral of certain incidents to OSI, by itself, fails to establish that he took "reasonable measures to abate the harm". *Cf.* Johnson v. Connolly, 378 F. App'x 107, 109 (2d Cir. 2010) (Summary Order) ("[w]e conclude that reasonable measures were taken to abate any such harm based on (i) the investigation of the May 2008 incident, (ii) the monitoring of inmates and visitors during visits, and (iii) [the inmate's] designation to the secure Special Housing Unit").

Thus, I conclude that there are questions of fact as to whether Eckert's actions constituted "reasonable measures to abate the harm".

### Qualified Immunity

Eckert argues that he is entitled to qualified immunity as the Second Circuit in Tangreti found that the "scope of supervisory liability under §1983 for violations was not clearly established at the time of the relevant conduct". 983 F.2d at 612, 619-20. McDay responds that "[i]t is clearly established law that the Eighth Amendment not only prohibits excessive force, but also requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody". Percinthe v. Julien, 2009 WL 2223070, *18 (S.D.N.Y. 2009).

"Qualified immunity . . . shields public officials, including law enforcement officers, 'from liability for civil damages under [§1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Linton v. Zorn, 135 F.4th 19, 30 (2d Cir. 2025) (*quoting* Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982)). Of course, it is often "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be". Pearson v. Callahan, 555 U.S. 223, 236 (2009).

It has long been established that "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody". Hayes, 84 F.3d at 620 (citing Farmer, 511 U.S. at 832). It is also well-established that "prison officials are liable for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate." Id.

More to the point, it has long been established that "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that excessive force is being used". Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Therefore, I conclude that the relevant constitutional right was clearly established and that qualified immunity does not apply. Accordingly, I recommend that Eckert's motion for summary judgment be denied.

**B.     Motions to Exclude Expert Testimony**[5]

Defendants move to exclude McDay's experts on the topics of use of force, supervising staff, pain and suffering, psychiatric distress, DOCCS investigations, and veracity of COs. [324, 326, 327, 328]. McDay moves to exclude defendants' experts on the topics of excessive force, psychiatric distress, and toxicology. [331, 334, 335].

An expert witness may offer testimony if it is demonstrated by a preponderance of the evidence that: "(a) the expert's scientific, technical, or other specialized knowledge will help

---

[5]     "Motions regarding the admissibility of expert testimony are non-dispositive". Lutz v. Kaleida Health, 2023 WL 6617737, *1 (W.D.N.Y. 2023).

the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert's opinion reflects a reliable application of the principles and methods

to the facts of the case." Fed. R. Evid. 702; *see* United States v. Jones, 965 F.3d 149, 161 (2d Cir.

2020). "The fundamental requirements are . . . that [the proposed expert] evidence be relevant

and reliable". Jones, 965 F.3d at 161.

      "Rule 702 embodies a liberal standard of admissibility for expert opinions,

representing a departure from the previously widely followed, and more restrictive, standard of

Frye." Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005) (*citing* Frye v. United

States, 293 F. 1013, 1014 (D.C. Cir. 1923)). "There is a presumption that expert evidence is

admissible, and 'the rejection of expert testimony is the exception rather than the rule'." Chen-

Oster v. Goldman, Sachs & Co., 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (*quoting* Fed. R.

Evid. 702 advisory committee's note (2000)).

### 1.    McDay's Corrections Supervision Expert (Patrick Hurley) [324, 355, 369]

      Defendant Eckert moves to exclude the expert testimony of Patrick Hurley [324],

who opined that "Lewalski posed an outsized and substantial risk of using excessive force

against inmates at Wende", as evidenced by his "disproportionate number of referrals" to OSI

and other "red flags" such as false reporting, and that Eckert failed to take steps that could

reduce the risk of violence. [357-30] at 5-8.

      Eckert argues that Hurley's opinions are "unreliable" because they are

speculative, unsupported by analysis, and undermined by certain facts regarding Eckert's

knowledge of any issue and his ability to intervene. [324]. While Hurley's opinion speaks too

much in generalities and could have included more citations to relevant policies or best practices,

-20-

he is clearly qualified to offer insight into how a reasonable superintendent might have acted under the circumstances. *See* <u>Ramsay-Nobles v. Keyser</u>, 2019 WL 4383187, *12-13 (S.D.N.Y. 2019) ("[b]est correctional practices is a subject to which expert testimony is appropriately given. . . . One might prefer that various assertions [the expert] makes about best practices were accompanied by citations to sources that document those practices. . . [but t]he failure to do that is not necessarily fatal to his testimony . . . 'There is nothing wrong with relying on experience'").

I conclude that Hurley's opinion is likely probative and sufficiently reliable, and will be subject to cross examination. Thus, I will allow his opinion and testimony. However, I agree that the portion of Hurley's opinion which suggests there was a specific threat to Taylor is not sufficiently grounded in any admissible evidence and should be excluded. Subject to that limitation, the motion to exclude is denied.

## 2.    Plaintiff's Pain and Suffering Expert (Zhonghue Hua, M.D., Ph.D.) [326, 351, 379]

Defendant White moves to exclude Dr. Hua's opinion, at least as it relates to Taylor's pain and suffering from the alleged October 6th attack and his October 7th hanging death. [326]. White argues that those issues are a matter of common knowledge and experience for the average juror. I tend to agree, but that subject is only a small portion of Dr. Hua's opinion. *See* Hua Opinion [326-2], ¶¶45-46. White also challenges Dr. Hua's methodology in making cause-of-death determinations, but Taylor's cause of death is uncontested.

Dr. Hua renders opinions on relevant topics such as whether Taylor was conscious during the alleged beating (and thus capable of experiencing pain), to what extent he was under the influence of K2 at the time, and to what extent his reported injuries were

consistent with being beaten. Those opinions are relevant and properly based on Dr. Hua's substantial experience. *See, e.g.*, Ramirez v. Chip Masters, Inc., 2014 WL 1248043 at *9 (E.D.N.Y. 2014) ("plaintiff presented [] expert testimony . . . that [the victim] suffered 15 to 30 seconds of conscious pain and suffering before dying at the scene").

Therefore, the motion to exclude is denied.

### 3. Plaintiff's Psychiatric Distress Expert (Daniel Selling, Psy.D.) [327, 352, 382]

White also moves [327] to exclude Dr. Selling's opinion that Taylor experienced "significant psychological distress" as a result of the October 6th incident and that such distress was a "substantial contributing factor to his suicide twelve hours later". Selling Opinion [327-2] at 9. White argues the opinion lacks sufficient foundation in the record evidence, which does not (to their reading) suggest such psychological distress on October 6th. [327-4]. McDay argues that Dr. Selling conducted a "psychological autopsy" of Taylor, which is a widely accepted methodology to analyze the cause of suicide, based on the record evidence and his professional expertise and experience. [352].

"[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999). "There is nothing wrong with [relying on experience]: the very text of Fed. R. Evid. 702 provides that an expert can be qualified on the basis of his 'knowledge, skill, experience, training, or education[.]'" Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015) (*quoting* Fed. R. Evid. 702). Dr. Selling's opinions are supported by his substantial professional and clinical experience in correctional settings, including experience with violence and suicide. [352-2] at 7. To the extent that Dr. Selling's opinion is

contradicted or undermined by observational evidence of Taylor's mental state, such contradictions can be thoroughly explored on cross-examination.

Therefore, White's motion to exclude is denied.

### 4.    Defendants' Excessive Force Expert (John Rourke) [331, unopposed, 373]

McDay moves [331] to exclude defendants' proposed expert John Rourke, a veteran DOCCS security officer, who opined variously that (1) there was "no evidence" that the officer defendants used excessive force; (2) the officer defendants were responding to a medical emergency in Dante Taylor's cell; and (3) it is reasonable to assume that Taylor's injuries were self-inflicted after he ingested K2. McDay cites insufficient foundation, improper methodology, and a lack of medical expertise. [331]

Defendants failed or declined to oppose this motion. *See* Notice [373]. As "[t]he proponent of expert testimony carries the burden of establishing its admissibility by a preponderance of the evidence" (Choi v. Tower Research Capital LLC, 2 F.4th 10, 20 (2d Cir. 2021)), the motion is granted and Mr. Rourke's testimony excluded.

### 5.    Defendants' Psychiatric Distress Expert (Michael Rutter, Ph.D.) [334, 354,

McDay moves [334] to exclude the opinion and testimony of Dr. Rutter, a psychologist who defendants offer as a rebuttal witness to Dr. Selling regarding whether the October 6th incident contributed to Taylor's suicide. Rutter Opinion [334-4] at 6-19. McDay questions his credentials with respect to his experience with prison conditions, and argues his methodology is "empirically unsound" unsupported by any articles or studies. [334].

Dr. Rutter is a recently retired professor of clinical mental health counseling, including teaching courses on the assessment and treatment of suicidal and high-risk behaviors.

[334-4] at 6. In a previous role, he advised hospitals how to, among other things, prevent and respond to high-risk behaviors. Id. at 6-7. His doctoral dissertation concerned the relationship between stressful life events and psychological distress. Id. at 21. Therefore, Dr. Rutter appears qualified to give an opinion about the factors that may cause or contribute to suicide. As discussed above, "[n]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience". Kumho, 526 U.S. at 156.

Dr. Rutter reviewed the record and opines that factors other than the October 6, 2017 incident were the cause of Taylor's suicide. [334-4] at 16-17. To the extent his opinion is undermined by his lack of experience in the prison context or is contradicted by other scholarly work, such issues are properly resolved by the trier of fact after hearing McDay's competing evidence and cross-examination of the witness. Therefore, McDay's motion to exclude is denied.

### 6.    Defendants' Toxicology Expert (Christopher Rosenbaum) [335, 353]

McDay also moves [335] to exclude defendants' expert Dr. Rosenbaum, an emergency medicine physician and medical toxicologist, who opines that Taylor's presumed K2 usage prior to the October 6th incident likely caused or contributed to an agitated mental state, self-injurious behavior, being unresponsive to verbal cues, the need for him to be restrained, and exacerbated his mental health issues leading to his suicide. [335-2] at 5. McDay questions his expertise as to certain areas of his opinion, as well as his methodology.

Again, it seems to me that Dr. Rosenbaum has relevant expertise and his opinion about the potential effects of K2 would be relevant and helpful to a trier of fact. McDay offers a rebuttal expert, Dr. Steven Bird, who can adequately rebut any contested conclusions or inadequate foundations. I thus deny the motion to exclude.

-24-

7.    **McDay's Corrections Expert (John Ginnitti) [338, 360, 376]**

Finally, defendant Lewalski moves [338] to exclude the opinion and testimony of John Ginnitti, a former investigator with DOCCS OSI, who opines that there "was a culture and practice at Wende" of CO retaliation for real or perceived inmate misconduct, that officers would cover for each other by filing false reports, and that risk factors for such misconduct were present in this case. Ginnitti Report [338-1] at 7-13.

Lewalski argues that Ginnitti was also a fact witness, having been involved in the investigation of this incident at OSI, and was not so disclosed. [338] at 11-14. Lewalski argues that his Ginnitti opinion is based on his previous investigation, which acts to simply bolster that report. Also, he argues, Ginnitti's conclusions go the credibility of the COs, which is a question for the jury. In response, McDay argues that Ginnitti will circumscribe his opinion to what an experienced corrections expert might find notable from the officers' accounts of the October 6th incident. [360]. McDay argues the testimony is necessary to counter the officer defendants' self-serving accounts.

I agree with Lewalski that material portions of Ginnitti's opinion stray too far from the bounds of permissible expert opinion. To the extent that this witness would testify about his own knowledge of the facts in this case, the contents of the OSI report, or to impugn the credibility of COs at Wende or in general, that testimony is improper and shall be excluded. *See* Hill v. City of New York, 2007 WL 1989261, *8 (E.D.N.Y. 2007) (granting motion to exclude expert testimony about the "Blue Wall of Silence").

That said, Ginnitti's opinion and testimony is permissible to the limited extent of providing insight into the "correctional culture" of COs at facilities like Wende, and as to how such culture may have affected officer statements. *See* Katt v. City of New York, 151 F. Supp.

2d 313, 326-27 (S.D.N.Y. 2001) (expert permitted to testify about culture of police organization "in which police officers so value loyalty and mutual support that complaints or truthful testimony about misconduct by officers is strongly disfavored and met with ostracism or other retaliation"). However, Ginnitti should be careful to refrain from contradicting any specific factual contention by any officer defendant, or from speculating as to what may have actually occurred. Subject to those limitations, the motion to exclude is denied.

## CONCLUSION

For the reasons stated above, I recommend that defendants' motions for summary judgment [323, 325, 328, 329, 330, 332, 333] be denied. McDay's motion [331] to exclude the testimony and opinion of proposed expert John Rourke is granted, and the parties' remaining motions to exclude [324, 326, 327, 334, 338, 335, 336] are denied, subject to the limitations described above.

Unless otherwise ordered by District Judge Sinatra, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by February 25, 2026. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either

certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.


Dated: February 11, 2026

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge
